# Hollock v. Erie Insurance Exchange

C.P. of Luzerne County, no. 6790-C of 1999.

*Timothy G. Lenahan,* for plaintiff.
*Daniel B. Huyett,* for defendant.

OLSZEWSKI, *J.,* January 7, 2002—

### FINDINGS OF FACT AND
### CONCLUSIONS OF LAW

And now, January 7, 2002, at 1 p.m. following a non-jury trial and in support of the attached verdict, the

court hereby issues the following findings of fact and conclusions of law:

## I. *Findings of Fact*

(1) On June 8, 1992, plaintiff Jean Hollock, was involved in a motor vehicle accident when she was struck from behind by a vehicle operated by Dominick DiGennari. (Jointly agreed upon stipulation no. 1.)

(2) Jean Hollock instituted a third-party action against Mr. DiGennari. (Jointly agreed upon stipulation no. 2.)

(3) After obtaining consent to settle from plaintiff's underinsured motorist carrier, Erie Insurance Exchange, on May 1, 1997, plaintiff's counsel settled the third-party action for $80,000. DiGennari's liability limits were $100,000. (Jointly agreed upon stipulation no. 3.)

(4) Erie issued a policy of insurance to Jean Hollock, no. Q03 2204969A, which was in effect on the date of the June 8, 1992 accident, providing for underinsured motorist coverage in the amount of $500,000 per person/$1 million per accident. (Jointly agreed upon stipulation no. 4.)

(5) On or about March 10, 1992, Jean Hollock increased her underinsured motorist coverage from $250,000 per person to $500,000 per person at the behest of Erie. (P-3, P-4, trial testimony of Jean Hollock.)

(6) Plaintiff had insurance policies with Erie since 1985 and paid premiums to Erie for said coverage since 1985. (P-133, Erie's answers to interrogatories, no. 9, jointly agreed upon stipulation no. 8.)

(7) On March 5, 1996, plaintiff's counsel placed Erie on written notice of an underinsured motorist claim, noting he believed the value of the case was greatly in ex-

cess of the tort-feasor's $100,000 liability coverage. (P-6; Nardone trial testimony.)

(8) On March 8, 1996, Erie acknowledged Jean Hollock's UIM claim for injuries stemming from the June 8, 1992 motor vehicle accident per the claim management system file note of Claims Supervisor Joseph Kranyecz. (P-7, EIHOL 02225; trial testimony of Joseph Kranyecz.)

(9) On March 8, 1996, Erie assigned the claim for UIM benefits to one of its multi-line adjusters, Kirk W. Space.

(10) During the pendency of the Hollock UIM claim, Erie had claim handling expectations and guidelines in effect for each Erie Insurance claims handler to reinforce the claims handling practices expected. (P-97, EIHOL 02275.) As of 1995, Erie recognized that it was necessary to implement a company-wide program regarding handling of UIM claims, and established a team of individuals to set guidelines with regard to handling UIM claims. (Ludrof trial testimony.) The Erie guidelines were written as a team approach, and were approved by Jeffrey Ludrof, senior claims manager. (Horvat trial testimony.)

(11) Before the filing of the Hollock UIM claim, Erie recognized that providing UIM coverage to its insureds created claim-handling issues unique to UIM claims that necessitated the implementation of a company-wide UIM training program for all of its field adjusters and claim supervisors. (P-119, Vehec, p. 33-35; Ludrof and Vehec trial testimony.)

(12) Before and during the life of the Hollock UIM claim, Erie sponsored training workshops for claim adjusters and claim supervisors setting forth Erie guide-

lines, expectations and procedures for handling UIM claims, in recognition of the fact that UIM claims handling was a fertile area for bad faith. (P-119, Vehec, p. 22; Ludrof trial testimony.) As of 1995, Erie began workshops in Pennsylvania and West Virginia on the topic of good faith claims handling.

(13) Neither Debbie Matta nor Scott Brown, both of whom were home office examiners assigned to the Hollock UIM claim, felt it was their responsibility or duty to ensure that Field Adjuster Kirk Space and his claim supervisor, Joseph Kranyecz, complied with Erie's claim-handling guidelines, practices and/or procedures. (P-118, Matta, pp. 107, 108.) (P-117, Brown, p. 36.)

(14) Erie's guidelines were drafted with the understanding that they should usually be followed, and should be followed in the "majority" of cases. (Horvat trial testimony.)

(15) As early as 1995, Erie expected the items in plaintiff's exhibit 99d (Erie's role as a UIM carrier-Pennsylvania) to be followed where applicable, and said guidelines were approved by Erie's senior vice president of claims, Jeffrey Ludrof. These guidelines were intended to call attention to the fact that a UIM claim involved Erie's policyholder and that the policyholder had to be dealt with honestly and fairly.

(16) During the life of the Hollock UIM claim, Erie was committed to specific contact standards to be made with its claimant/customers, including Jean Hollock. (P-97, EIHOL 02276.) Plaintiff's exhibit 97, entitled "Claims-handling expectations" was circulated to all Erie branch managers and claims managers, to be distributed to claims supervisors. (Horvat trial testimony.)

(17) If nothing prohibited it, Erie expected the claims adjuster to follow the claims-handling expectations, P-97, which included a request for a face-to-face meeting with the insured, disclosing coverage to the insured, and entering a note in the CMS file that the extent of loss and coverages were documented. (Horvat trial testimony.)

(18) The record is replete with numerous instances where, for no obvious reason, the guidelines were either ignored or disregarded.

(19) Defense witnesses consistently testified that the guidelines were just that and could be deviated from on a case-by-case basis or if particular circumstances warranted deviation. Despite the fact that Erie witnesses struggled mightily to suggest why guidelines could be ignored, the testimony never established why deviation was warranted or appropriate in the Hollock case.

(20) The documentation one would reasonably expect, based not only upon Erie's own guidelines, but upon reasonable claim-handling practices, was shoddy at best, and in many instances, simply nonexistent. Erie's failure to follow its own guidelines cannot now insulate Erie from full and complete review of its claims process. Erie's lack of documentation makes it impossible for any person or entity to consider or corroborate the reasoning, rationale or basis of its decision-making process.

(21) The following Erie representatives reviewed the underinsured claim submitted by plaintiff: Kirk Space, claims adjuster assigned to the Erie Allentown branch; Joseph Kranyecz, claims supervisor, located in the Erie Allentown Branch; Scott Brown, home office examiner, located in Erie, PA; and Debbie Matta, home office ex-

aminer, located in Erie, PA. (P-133, Erie answer to interrogatories, no. 10.)

(22) Once a claim is acknowledged by Erie, Erie had a duty to promptly and thoroughly investigate the claim, including obtaining medical authorizations, an examination under oath, and a face-to-face meeting with the insured, as authorized under Erie's own policy at page 12. (Young trial testimony, and P-2, p. 12.)

(23) Under Erie's claims-handling expectations, Erie expected that face to face contact would occur with a UIM customer/claimant such as Jean Hollock as soon as a meeting could be conveniently arranged, with the claim handler offering to conduct such a meeting within 24 hours of the date the claim handler was assigned the file. (P-97, EIHOL 02276.)

(24) Contrary to Erie's claims-handling expectations, Kirk Space never offered to meet Jean Hollock face to face within 24 hours of his assignment to her UIM claim, and in fact, never conducted a face-to-face meeting with Jean Hollock. (P-115, Space, p. 116, ll. 11-12; Space trial testimony; P-97a, EIHOL 2276.)

(25) Charles Young, who was Field Adjuster Kirk Space's branch manager between 1996 and 1998, did not require or expect Kirk Space to ask for or conduct a face-to-face meeting with Jean Hollock within 24 hours of his assignment to her UIM claim, although Charles Young recognized Erie's right to do so. (P-120, Young, p. 14; Young trial testimony.)

(26) Contrary to Erie's claims-handling expectations, Kirk Space's opening file note in the UIM claim of Jean Hollock did not reflect that he discussed the extent of the loss and the coverages available for the claim with

Jean Hollock or her counsel, Attorney John Nardone. (P-97, EIHOL 02277, 02281.) (P-7, EIHOL 2225, Space exhibit 2.)

(27) A "reserve" in the insurance business is an amount set by the insurer on each claim or known potential claim such that, in the aggregate, the insurer's reserves will be sufficient to pay all losses and to provide the insurer with up-to-date ratemaking data.

(28) When Erie sets a reserve, as it did in the UIM claim of Jean Hollock on April 3, 1996, it is acknowledging that a claim has been made. (P-120, deposition of Charles Young, p. 11.) At trial, Charles Young testified that there are times a reserve is set before a UIM claim is made, which testimony is in contradiction to his deposition testimony at page 11, where he testified that Erie does not establish a reserve on a claim that has not been made. (Young trial testimony and deposition testimony, p. 11.) Mr. Young had no reason to dispute that a UIM claim had been made by Ms. Hollock as of the time the $30,000 reserve was established on April 3, 1996. (Young trial testimony.)

(29) This court rejects contentions of Erie witnesses that a UIM claim had not been made as of April 3, 1996. Erie's contention that the Hollock UIM claim was only a "potential" claim as of April 3, 1996, is not credible, given the fact that a reserve was established on April 3, 1996; a formal evaluation report was completed on April 3, 1996; Erie assigned an adjuster, Kirk Space, to the claim on March 8, 1996; Kirk Space requested documentation concerning Ms. Hollock's injuries from plaintiff's counsel on March 8, 1996; the file had been referred for home office review in April 1996 and remained open at the

home office even after home office rendered a decision on the consent to be bound issue in May of 1996. Further, Mr. Space did not post a reserve in 1997, saying he did not receive a "new" claim in 1997.

(30) The testimony of Mr. Space and other Erie witnesses that the UIM claim was not made until 1997 is not credible and cannot justify Erie's lack of investigation of the UIM claim from April 1996 until May 1997.

(31) This court specifically rejects Erie's contention that the Hollock claim was not an "actual" claim until Allstate's payment of $80,000 in April 1997, since Kirk Space testified that he knew, as early as March 1996, that both claims (third-party and UIM) could be pursued simultaneously, and that he had "several" of those types of claims. (Space trial testimony and P-115, Space deposition, pp. 174 and 175.)

(32) Per plaintiff's exhibit 134a, as early as June 10, 1992, Erie acknowledged a "potential" UIM claim on June 10, 1992, but did not establish a reserve at that time; Erie did, however, establish a reserve on April 3, 1996, after receiving John Nardone's March 5, 1996 "I represent" letter placing Erie on notice of a UIM claim.

(33) Based on the credible testimony of record, this court finds that upon notification of the UIM claim on March 5, 1996, Erie had the duty to begin investigating the UIM claim, regardless of the status of the third-party action. (Barnett trial testimony and Space deposition at pp. 174 and 175.)

(34) As part of John Nardone's March 5, 1996 correspondence, Nardone enclosed a declaration sheet reflecting $250,000 in UIM coverage, which Attorney Nardone understood was the coverage at the time of loss. (P-6;

trial testimony of John Nardone; trial testimony of Kirk Space.)

(35) Mr. Space acknowledged the UIM claim in correspondence to John Nardone dated March 8, 1996, stating "we are presently investigating this accident." (P-8; Space trial testimony.)

(36) In Kirk Space's March 8, 1996 correspondence to Attorney Nardone, despite knowing that Jean Hollock's UIM coverage was $500,000, he knowingly and intentionally refused to advise Attorney Nardone that the coverage was, in fact, $500,000. (P-8; trial testimony of John Nardone; trial testimony of Kirk Space.)

(37) In Kirk Space's March 18, 1996 correspondence, he indicates that the declaration sheet forwarded by Attorney Nardone was not the one in effect at the time of loss and asked Attorney Nardone to forward the correct declaration sheet. (P-9; trial testimony of John Nardone; trial testimony of Kirk Space.)

(38) As of March 5, 1996, Mr. Space knew the correct amount of underinsured coverage. (Trial testimony of Kirk Space.)

(39) On April 1, 1996, Attorney Nardone forwarded correspondence to Kirk Space indicating that the declaration sheet he provided was the only one he had in his possession and "Please indicate if the underinsurance is different than that identified on the declaration page I sent you." (P-11; trial testimony of John Nardone; trial testimony of Kirk Space.)

(40) Despite the April 1, 1996 request of Attorney Nardone, Kirk Space intentionally and deliberately did not advise John Nardone that the coverage was, in fact, $500,000, and allowed Attorney Nardone to act under

the impression that the coverage was $250,000. (Trial testimony of John Nardone; trial testimony of Kirk Space.)

(41) Kirk Space intentionally refused to advise Attorney Nardone as to the correct coverage ($500,000) until nearly one year later, April 23, 1997. (See P-35.) Mr. Space intentionally misled Attorney Nardone to believe that the coverage was $250,000 during this time period. (See P-12; trial testimony of John Nardone; trial testimony of Kirk Space.)

(42) This court specifically rejects as not credible the testimony of Kirk Space that the reason he did not disclose the correct coverage earlier was because the UIM claim had not been "made."

(43) Mr. Horvat could not articulate or posit a single situation where a claims handler knowing its insured's counsel was mistaken regarding available coverage, should not immediately disclose the correct coverage. (Horvat trial testimony.)

(44) Mr. Kranyecz acknowledged Erie's adjusters have an obligation to be honest, and there is no situation in which an adjuster should not disclose the correct policy limits where he is aware that claimant's attorney is under a mistaken impression regarding same. (Kranyecz trial testimony.)

(45) This court accepts as credible the testimony of Attorney John Nardone that, in order to verify the correct coverage information and UIM policy limits, he went to the only completely reliable *source* to obtain the correct coverage information, namely, Erie. The court further accepts as credible Attorney Nardone's testimony that he was misled by Mr. Space into believing that the

correct coverage was $250,000, by virtue of Mr. Space's failure to respond to Mr. Nardone's specific coverage request in his April 1, 1996 correspondence. This court further finds that there was absolutely no good faith basis or reason to wait over one year (until April 23, 1997) to advise Attorney Nardone of the correct UIM coverage available. *This conduct by Mr. Space was the first sign of dishonest and disingenuous claims handling practices which persisted throughout the Hollock claim.* (Nardone trial testimony; Barnett trial testimony.)

(46) At the time the underinsured claim was presented on March 5, 1996, John Nardone inquired with Erie as to whether they would agree to be bound by the third-party verdict against the tort-feasor, which was scheduled for trial in Luzerne County. Attorney Nardone requested Erie to agree to be bound by the third-party verdict in an effort to avoid litigation since Ms. Hollock was afraid of speaking in public and being subjected to the rigors of trial. (Nardone trial testimony.)

(47) Under Hollock's auto insurance policy, Erie could be bound by the verdict in the DiGennari trial, if, and only if it gave its express written consent, and Erie had an absolute contractual right to grant or withhold such consent.

(48) This court accepts Attorney Nardone's testimony that Erie did not directly respond to John Nardone's inquiry on whether Erie would agree to be bound by the third-party verdict against the tort-feasor issue at any time prior to settlement of the third-party action. Instead, Erie merely said it would not pursue the third-party carrier (Allstate) for bad faith in the event of an excess jury verdict. (P-9; trial testimony of John Nardone.) This court

finds not credible the testimony of Kirk Space that he advised Attorney Nardone that Erie would not consent to be bound in an undocumented telephone conversation.

(49) With regard to whether Erie would agree to be bound by the third-party verdict, Erie's representatives exchanged communications between adjuster Kirk Space and his supervisors, internally making a decision that they would take a "wait and see" approach with regard to the third-party trial. (Brown trial testimony.)

(50) This court accepts as credible the testimony of John Nardone that he accepted $80,000 of the $100,000 policy limits, with the full consent of Erie, since proceeding to trial against the tort-feasor would not be justified by any award, since Erie declined a bad faith assignment and Erie had not responded to his request to be bound and his client would be subject to the costs and rigors of trial only to face the potential of relitigating the UIM claim in arbitration, at Erie's option. (Nardone trial testimony.)

(51) Between March 1996 and May 1, 1997, Erie did not request the insured sign any authorizations to gather medical records independently; did not request a face-to-face meeting with the insured; did not request an examination under oath; did not request an IME; and failed to take other affirmative steps to investigate the plaintiff's claims. (Space trial testimony.)

(52) Erie's conduct in failing to affirmatively investigate the underinsured claim between March 1996 and May 1997 is directly contrary to its own UIM claims guidelines and policies, which require the adjuster to "spring into action" when presented with a UIM claim,

recognizing that this is a "most treacherous" area of litigation. (P-98d, Erie's role as UIM carrier-Pennsylvania; trial testimony of Jeffrey Ludrof.)

(53) Pursuant to its contract of insurance with Jean Hollock, upon presentation of her March 5, 1996 claim for UIM benefits arising from the June 8, 1992 motor vehicle accident, Erie had the right to require Jean Hollock to submit to a statement, an examination under oath and medical examinations. (P-2, P-115, Space, pp. 55, 56; trial testimony of Kirk Space; P-2.)

(54) Although Erie was placed on notice of Jean Hollock's claim for UIM benefits on March 5, 1996, it waited until after May of 1998, a period of 26 months, before its counsel requested medical exams or obtained Ms. Hollock's statement under oath. (P-115, Space, p. 58; trial testimony of Kirk Space; trial testimony of Attorney Panowicz.)

(55) Erie, through Kirk Space, completed its one and only "evaluation report" on April 3, 1996, which was approved by his supervisor, Joe Kranyecz on April 8, 1996. The evaluation report reflects a reserve of $30,000 and a "top" settlement value of $30,000. (P-12.)

(56) As of April 1, 1996, Erie had permission of John Nardone to review the first-party file, which Attorney Nardone voluntarily provided to Erie. (Space trial testimony and P-11.)

(57) At the time Mr. Space performed his evaluation report on April 3, 1996, he had the following information which he received from Attorney Nardone on April 1, 1996: Plaintiff's medical records and bills, personnel file from Social Security Administration and June 28, 1995 vocational report of Mark Lukas, which included

significant projections regarding loss of future earnings and loss of future earning capacity. (Space trial testimony and P-11/D-5.)

(58) In his April 3, 1996 evaluation report, Mr. Space states that amount of lost wages is projected by Mark Lukas at $41,860 and $28,300 out of pocket. It was noted that plaintiff had surgery and was totally disabled for six weeks following surgery with first-party wage loss payments during that time of $1,500 and medical bills of $12,319.08 paid by Erie under plaintiff's first-party benefits. (P-12.)

(59) In his April 3, 1996 evaluation, Mr. Space states the injuries were "cervical and rt trapezius strain, rt cubital tunnel syndrome with rt radial sensory neuropathy. Prog. guarded." (P-12.) He further states "insured was rear-ended in a prior accident on November 28, 1990, wherein she incurred rt side neck, trapezius and rt hand pain. It is felt that the June 1992 accident aggravated pre-existing conditions but that the cubital tunnel syndrome was primarily the result of the 2nd accident." (P-12.) He further indicated "insured still complains of cerv/trapeziul pain, headaches and more importantly the inabilities to perform work functions such as sitting or standing for extended periods, inability to open drawers, pull files, etc. as indicated in the June 1995 report of vocational evaluator Mark Lukas. Med. reports indicate full range of motion of all affected areas with good recovery from rt ulnar nerve transposition of April 3, 1993, which render insured's complaints somewhat subjective. Peer denied chiro care April 1994." (P-12.)

(60) In his April 3, 1996 evaluation report, Mr. Space recognized that Ms. Hollock was having problems per-

forming her work functions such as sitting, standing for extended periods, inability to open drawers, or pull files. (P-12.)

(61) In his April 3, 1996 evaluation report, Mr. Space does not mention that in the June 28, 1995 report of Mark Lukas, Mr. Lukas opined that should claimant be unable to continue in her present employment beyond January of 1996 and be forced to seek alternate employment, she would have a loss of earning capacity between $103,540 and $192,050. (P-12 and P-39/D-6.)

(62) The $30,000 reserve and settlement value established by Kirk Space on April 3, 1996, is an arbitrary figure, with absolutely no relationship to the information Kirk Space had available to him at the time he performed this evaluation. Other than stating that the $30,000 reserve was based upon his "experience," Mr. Space failed to articulate any reasonable, rational basis for the reserve. *His failure to do so is the second objective illustration of Erie's disingenuous attempt to handle Ms. Hollock's claim.*

(63) In arriving at his $30,000 evaluation on April 3, 1996, Kirk Space unilaterally decided to discount the projections from Mark Lukas (whom Erie has used as Erie's expert on other claims), without any contrary medical or vocational evidence at that time, based on Mr. Space's view that Mr. Lukas went outside his expertise. (Space trial testimony.) Mr. Space did not indicate that he was discounting Lukas' projections in his evaluation report, nor did he ever explain why he felt Lukas went beyond his expertise. (P-12; Space trial testimony.)

(64) Despite the fact that the time he performed his April 3, 1996 evaluation he was accepting Dr. O'Brien's April

13, 1993 report addressing the causal relationship between the June 1992 accident and the right cubital tunnel injury and the need for surgery, recognized $12,319 in medical bills, approximately $42,000 in wage loss and $28,000 for lost household services, totaling approximately $80,000 in special damages, (with an additional projected lost earnings between $103,540 and $192,050 in the event she was unable to continue working beyond 1996), in a case of clear liability and with no contrary medical or vocational evidence at that time, Kirk Space evaluated the top settlement value and reserve at a total of $130,000 gross, or $30,000 after the tort-feasor's offset. (Space trial testimony and P-12.)

(65) Despite arriving at an evaluation and settlement figure of $30,000 on April 3, 1996, Erie did not make a settlement offer at that time. Erie's one and only settlement offer was made on July 14, 1997, over one year later. (P-66.)

(66) Kirk Space had been trained by Erie to pay extra special attention to claims for UIM benefits because it is an area where there is significant potential for bad faith. (P-115, Space, p. 46.)

(67) Upon receipt of an "I represent" letter from its insured's UIM attorney, Erie trained its adjusters to spring into action and call the insured's attorney to get the details of the injury, the attorney's opinion on the value of the claim, the condition of the insured, and the attorney's demand. (P-99, EIHOL 02574; Ludrof trial testimony.)

(68) During the life of the Hollock UIM claim, Kirk Space was not aware of Erie's UIM training guidelines to spring into action upon receipt of an "I represent" letter, nor did Kirk Space believe he was required to call

the insured's counsel to obtain the attorney's demand, opinion on value, details of injury, or condition of the insured. (P-115, Space, 49, 50.)

(69) In Erie's claim management system, its claim supervisor and its branch manager both have the responsibility to insure that the field adjuster is complying with Erie's guidelines, practices and procedures in handling a given claim and the branch manager has the additional responsibility to insure the claim supervisor is also in compliance with Erie's claim-handling guidelines, practices and procedures. (P-119, deposition of Vehec, p. 65.)

(70) Based upon Erie policy and guidelines, Erie claim adjusters have a duty to promptly and thoroughly investigate all claims, particularly UIM claims. (P-120, Young, p. 10.)

(71) Erie policy and guidelines expect its claim handlers, supervisors and home office examiners to handle all claims submitted fairly, honestly and as the Erie employee could expect to be treated if he or she had a claim. (P-115, Space, p. 44.) (Jointly agreed upon stipulation, no. 23.)

(72) If an Erie adjuster, supervisor or home office examiner needed to deviate from Erie's procedures to help resolve a claim, Erie guidelines indicate that any such deviation should be documented in the file notes so that everyone looking at the file would know what happened. (Claims-handling expectations, P-97, EIHOL 02290; Horvat trial testimony; Blazek trial testimony.)

(73) From September 1, 1995, Erie's reserving philosophy has been to set reserves on the basis of what the ultimate probable cost of the claim will be and to do so

as early as possible in the life of the claim's file. (P-97, EIHOL 02282.)

(74) Erie's reserve philosophy's purpose is to establish, as early as possible in the life of the claim file, the amount of money that will actually be paid on the case exclusive of litigation costs, attorney's fees, investigative costs and settlement value. (P-115, Space, p. 138; P-106, EIHOL 02629.)

(75) The Erie claims manual specifically states that there should be regular re-evaluations and reserves reviewed at least every 90 days, and a claims note entered to confirm that a reserve review took place. (P-97, EIHOL 2305, 2310; P-99, EIHOL 2559; P-106, EIHOL 2629, 2630.) Mr. Space acknowledged that there was no CMS note reflecting he reviewed the reserve every 90 days. (Space trial testimony.)

(76) Erie requires reserves to be reviewed regularly and recognizes that a reserve becomes inaccurate any time information in the file indicates the ultimate final cost is not reflected in the reserve. (P-97, EIHOL 02282, 2305, 2310; P-99, EIHOL 2536, 2559; P-106, EIHOL 2629, 2630.)

(77) Plaintiff's exhibit 97 (EIHOL 2282) is a recapitulation of the information in the Erie's reserving policy and guidelines concerning reserves, which include "to set reserves on the basis of what the ultimate probable cost of the claims will be, and to do so as early as possible in the life of the claim file," to "promptly investigate coverage, liability and value of damages" to "regularly review reserves as a reserve becomes inaccurate any time information in the file indicates the ultimate final cost is not reflected in the reserve" and to "adjust

reserves accordingly upon receipt and review of any new information." "Claims supervisors are required to acknowledge receipt of an evaluation report with a CMS file note. That note should also state their concurrence or disagreement with the findings in the evaluation report." (Horvat trial testimony, P-97, EIHOL 2282.)

(78) At the time of handling this claim, Kirk Space understood that Erie policies and procedures required him to review the Hollock reserve every 90 days. Despite that requirement, Kirk Space's claims file notes do not reflect that he reviewed the reserve every 90 days. (P-115, Space, p. 89; Space trial testimony.)

(79) Erie trains its claim supervisors to review reserves set by claim handlers/field adjusters periodically, at least every 90 days. (P-106, EIHOL 02630.)

(80) Erie's Allentown branch manager, Charles Young, who was the supervisor of Joseph Kranyecz during the life of the Hollock UIM claim, was unaware of any Erie policy, procedure or guideline requiring a claim supervisor to review a reserve every 90 days. (P-120, Young, p. 216.)

(81) Erie's home office examiner supervisor, Michael Vehec, during the life of the Hollock UIM claim, did not know that Erie had a guideline, practice, procedure or policy requiring a claim supervisor to reserve review every 90 days. (P-119, Vehec, p. 49.)

(82) Claim Supervisor Joseph Kranyecz, in spite of having worked for Erie for 30 years, 20 years of which were spent as a claim supervisor, was unaware of any Erie guideline, policy, procedure or claim supervisor training literature that suggested or required him to re-

view and/or report on reserves, including a 90-day requirement. (P-116, Kranyecz, p. 18, p. 33.)

(83) During the life of the Hollock UIM claim, Home Office Claim Examiner Deborah Matta, recognized that it was the responsibility of Claim Supervisor Joseph Kranyecz, to review the reserve set by Field Adjuster Kirk Space, every 90 days and to enter a claim management system file note documenting that review. (P-118, Matta, p. 106.)

(84) Home Office Claim Examiner Scott Brown, was unaware of Erie's claim supervisor 90-day reserve review policy, procedure, guideline and/or claim supervisor training literature during the time he was involved in the UIM claim of Jean Hollock from April 1996 until October of 1996. (P-117, Brown, p. 75.)

(85) The only reserve set by Erie employees during the entire life of the Hollock UIM claim was $30,000, established on April 3, 1996. (P-12, EIHOL 00843.) (Space depo. exhibit 11.)

(86) CMS notes fail to indicate the $30,000 reserve set by Erie Claim Handler Kirk Space, on April 3, 1996, was not reviewed every 90 days thereafter by Kirk Space or his supervisor, Joseph Kranyecz. (P-117, Brown, p. 78.) (P-118, Matta, p. 106.) (P-115, Space, p. 89.) This court rejects the testimony of Kirk Space and Joe Kranyecz that they would remember having reviewed their reserve every 90 days every time the file came up on diary, as not credible or worthy of belief.

(87) At the time Mr. Space performed his April 3, 1996 evaluation, the medical and vocational evidence submitted by claimant was uncontradicted. At that point, Erie

had no IME, vocational expert or biomechanical expert. (Space trial testimony.)

(88) Erie's guidelines, policies, procedures and claim supervisor training literature require its claim supervisors to acknowledge receipt of an evaluation report from the claim handler/field adjuster and state their concurrence or disagreement with the adjuster's findings in the evaluation report with a separate claims management system file note. (P-97, EIHOL 02282; P-103, EIHOL 02590.)

(89) Part of Erie's reserve review philosophy requires those adjusters involved in the handling of a UIM claim to adjust reserves accordingly upon receipt and review of any new information. (P-115, Space, p. 89.) (P-97, EIHOL 02282.)

(90) The ultimate final cost payment to Erie on the UIM claim of Jean Hollock was $500,000, rendering the only set reserve of $30,000 grossly inaccurate, according to Erie's own reserving philosophy. (P-106, EIHOL 02629.) (P-97, EIHOL 02282.)

(91) After plaintiff settled her claim with the third-party tort-feasor and obtained Erie's consent to settle, on May 1, 1997, Erie, through its claims adjuster, Kirk Space, requested, for the first time, a written demand from plaintiff's counsel. (P-38.)

(92) On May 7, 1997, plaintiff's counsel provided Erie with a detailed seven-page demand letter, with enclosures, that included all of plaintiff's medical records and medical bills, the deposition transcripts of both plaintiff's and defendant's medical experts in the third-party action, and confirmation of plaintiff's wage loss, including vocational reports. Plaintiff's counsel advised that

an arbitration award could well exceed Erie's policy limits of $500,000, but made a settlement demand of $450,000 in an attempt to settle the claim in an expeditious fashion. (P-39.)

(93) As part of the May 1997 demand package, Erie received several pieces of information which Erie did not have previously which should have caused Erie to reevaluate the value of this claim:

(a) deposition transcripts taken in the third-party action of Dr. Frank O'Brien and Dr. Alice Coyle, the tortfeasor's IME physician, both of whom confirmed that plaintiff's loss of strength in her right hand, (P-39) and further corroborated the causal nexus of Ms. Hollock's injuries to the June 8, 1992 accident (which Mr. Space unilaterally discounted saying Dr. Coyle did not know of the severity of the first accident, despite the fact that Mr. Space did not do his own investigation of the 1990 accident including getting photographs of those vehicles). Dr. Coyle was retained by the third-party carrier, whose primary obligation was to their insured, the tort-feasor, as contrasted to the obligations between Erie and their UIM claimant, Ms. Hollock. Nonetheless, Dr. Coyle authored a detailed narrative report, and a supplemental report after reviewing the chiropractic record of Dr. Virgil Thomas and provided a detailed deposition for use at trial in which she confirmed the following:

(1) The right arm nerve injury sustained by the claimant was related solely and directly to the June 8, 1992 motor vehicle accident;

(2) The surgery performed by Dr. O'Brien was only minimally effective and Ms. Hollock went on to develop

a loss of strength of 75 percent in her dominant upper extremity;

(3) The loss of strength and other residuals related to the nerve injury prevented Ms. Hollock from performing fine precision movements with her upper extremity and, specifically, those tasks associated with her job and, more importantly, the position to which she could have been promoted but for her limitations;

(4) The limitations and resulting disability were permanent.

Dr. O'Brien, the plaintiff's medical expert, also provided a lengthy and thorough deposition, in which he agreed with all of the opinions of Dr. Coyle and, specifically, those relating to causation, poor response to surgery, and loss of strength and disability.

(b) a report from Dr. Kammen, indicating that plaintiff was suffering from depression, which progressed to the point that in January of 1997, she was referred for psychological care by her family physician. Dr Kammen's report confirmed her depression and significant fear of driving, and that plaintiff was prescribed Prozac and occupational therapy. Mr. Space acknowledged that the reports of Dr. Kammen, submitted on May 7, 1997, discussing a psychological component to Ms. Hollock's injuries, were not part of the information he had used for his April 1996 evaluation, and, that as of May 1997, he had no evidence to contradict Dr. Kammen's opinions, including her opinions that Ms. Hollock made a full recovery from the 1990 accident and that her difficulties at work began to manifest after the June 1992 accident. (Space trial testimony.)

(c) reports from plaintiff's supervisor, Debbie Durland, dated April 14, 1995, and August 12, 1996, that plaintiff had been unable to advance from the GS-7 level with the Social Security Administration as a result of her physical limitations, since she was unable to perform the significant writing, typing, lifting files and other tasks associated with the GS-8 position. Jean Hollock was performing job functions of a GS-9/10 position as a hearing office supervisor, but was being paid at a GS-7 level since she was unable to advance through the GS-8 level, losing $7,700 per year in income. Mr. Space never independently computed the lost earning capacity or work life expectancy, despite having the government pay scale information as part of the May 1997 submission. (Space trial testimony.)

(d) the report of Mark Lukas dated January 29, 1997, projecting wage loss of $7,700 per year through age 65 totaling $146,300, and further that she may be forced to stop full-time employment in the near future as a result of her injuries, with a loss of between $128,000 and $256,000 over her lifetime, for a total wage loss and loss of earning capacity between $339,760 and $429,360. As of May 7, 1997, Kirk Space knew that Ms. Hollock was claiming a substantial loss of income and permanent residual impairment which prohibited her from doing parts of her employment.

(e) per the January 29, 1997 report of Mark Lukas, lost household services were being claimed at $68,640. (D-6 and P-39; Space trial testimony.)

(f) perhaps most significantly, Mr. Space unilaterally "discounted" Mr. Lukas' wage projections without any contrary medical or vocational evidence, or professional

experience to do so. He also failed to in any way document his CMS notes with his reasons for doing so. *This is the third objective illustration of Erie's disingenuous attempt to handle Ms. Hollock's UIM claim.*

(94) In Kirk Space's own claim note dated May 9, 1997, summarizing the demand letter, he admits that the depositions taken in the third-party action corroborate that any repetitive continual movements such as writing or typing for several hours would be intolerated. (P-40.)

(95) In the May 9, 1997 claims note, Kirk Space also recognized that the plaintiff's supervisor, Debbie Durland, was corroborating that plaintiff had difficulty writing, using the computer and typewriter and doing general lifting or carrying files, opening her desk drawer, taking notes, and that they made special accommodations for her to help her such as providing her with an electric stapler, and a Brother typewriter, and assigning a helper to her for certain duties and removing certain duties from her due to lack of dexterity, and that these problems began in June 1992 and have gotten worse. (P-40.) Mr. Space recognized that Ms. Durland further indicated that the promotion to GS-8 position would involve pulling case files and repetitive movement to arms and turning pages and stamping and numbering exhibits. (P-40.)

(96) The information received from Debbie Durland was uncontradicted. Mr. Space never followed up with Ms. Durland to explore this issue further, despite a suggestion by his supervisor on May 14, 1997, that he do so, saying that he determined that was not important. (P-44; trial testimony of Kirk Space and Joseph Kranyecz.) Since the largest element of plaintiff's claim was

lost earnings/earning capacity, upon receipt of the May 7, 1997 demand, a reasonable claims adjuster would have been expected to either contact plaintiff's supervisor, Ms. Durland, to affirm the representations made, or obtain a vocational expert with the requisite knowledge to perform the analysis of the government pay scale. Although Erie claimed it was obtaining a vocational expert on May 12, 1997, it did not do so until August 1998. (Nardone trial testimony.)

(97) *Mr. Space's decision to follow up with and indeed, to intentionally ignore Ms. Durland, is the fourth objective illustration of Erie's disingenuous attempt to handle Ms. Hollock's UIM claim.*

(98) In Mr. Space's claims note, he states "I would not object to the vocational study of Mr. Lukas if it were a given that Mrs. Hollock is unable to perform her duties at work and this were documented by the report of the orthopedic." (P-41.) Mr. Space's statement is outrageous given that Erie did not have any evidence to contradict the report of plaintiff's supervisor, Debbie Durland, regarding the difficulties plaintiff was having performing her duties at work, and further given that Mr. Space could have contacted Ms. Durland at any time. Further, Mr. Space's statement that the medical reports do not indicate that plaintiff cannot perform the duties and/or functions which would be expected in the positions in the vocational reports is frivolous and unfounded, since in Mr. Space's own claims notes he indicates that as part of the May 1997 submission, he received the deposition transcripts of Dr. Frank O'Brien and Dr. Alice Coyle, the IME physician retained by the tort-feasor in the third-

party action. In Mr. Space's own note of May 9, 1997, he indicates:

"These depositions would indicate that Mrs. Hollock has incurred a level of permanent loss of gripping ability in her right and it is described as being 80 lbs. of grip on the left hand versus 20 lbs. of grip on the right hand. I did observe within the deposition of Dr. O'Brien, where he described her loss as being described as 1/8 of the amount of grip on the right as opposed to the left. Mrs. Hollock did undergo a surgery in 1993, which in Dr. O'Brien's opinion, was successful in terms of range of motion of her arm and hand, however, he feels that it was unsuccessful in terms of the deminished [sic] strength in her hand. Nowhere within the depositions have I seen anything which were [sic] ascertain the fact that Mrs. Hollock cannot perform the duties and/or functions which would be expected in the positions which I have seen summarized in the vocational reports for the type of work that she was doing. *However, it is indicated within the doctors' depositions that any repetitive continual movements such as writing or typing for several hours at a time would be intolerated.*" (P-40, EIHOL 2178-2179.)

(99) Mr. Space's rejection of Mark Lukas' projections for loss of earnings as being unsupported by the opinions of the orthopedics are contradicted by Mr. Space's own analysis of the depositions of Dr. O'Brien and the IME physician, Dr. Coyle, as well as the uncontradicted information received from plaintiff's supervisor, Debbie Durland, concerning the difficulties plaintiff was having performing her position at work, as well as difficulties performing the tasks which would be associated with the GS-8 position which she was forced to decline, resulting in loss of earnings and earning capacity.

(100) As of May 1997, Erie knew that: (1) plaintiff was alleging Ms. Hollock suffered radial sensory neuropathy at the level of the right wrist, exacerbation of pre-existing cervical and right trapezial strain and developed right cubital syndrome (P-39); (2) plaintiff underwent 10 months of physical therapy in an attempt to improve her right arm strength, without any improvement; (3) in April of 1993, plaintiff underwent an anterior transposition of the right ulnar nerve, and received several more months of physical therapy; (4) plaintiff's post-surgical recovery was incomplete, leaving her with a loss of strength in her right hand and arm, as confirmed by not only her own treating physician, Dr. O'Brien, but the IME physician in the third-party action, Dr. Coyle; (5) as of May 1997, that plaintiff's injuries were posing her difficulties in her tasks of daily living and preventing her from future advancement within the Social Security Administration, as confirmed by the uncontradicted report of her supervisor, Debbie Durland; (6) two orthopedic physicians, Dr. O'Brien and Dr. Coyle, who was an IME physician retained by the third-party defendant, were confirming that Ms. Hollock could not perform repetitive tasks, such as writing or typing, as a result of her injuries; (7) plaintiff had an objective EMG study on August 1992 which showed an abnormality to the radial ulnar nerve, and that a prior EMG study performed in December 1991, prior to the June 8, 1992 accident but following the November 1990 accident, was normal. (Space trial testimony and P-39.)

(101) Despite the fact that the above losses represented a material difference from the time of the April 1996 evaluation by Kirk Space, no new evaluation reports were

generated, nor was the reserve changed in any way. (Space trial testimony.)

(102) As of May 1997, Erie was in possession of the EMG reports taken prior to the accident on December 11, 1991, which was normal, and the EMG performed in August 1992, after the accident, which showed ulnar and radial neuropathy.

(103) The discussion of the 1990 normal EMG and 1992 abnormal EMG in the first-party file peer review of Dr. Cavallo dated May 28, 1994, was available for Kirk Space's review as of April 1, 1996, based on the permission provided by Attorney Nardone to allow Mr. Space to review the first-party file. (Trial testimony of Space, Hosfield, Nardone.)

(104) In the May 7, 1997 submission, the 1990 EMG findings and 1992 EMG findings were discussed in the depositions of Dr. Coyle and Dr. O'Brien. (D-6 and P-39; see P-136.) The December 1991 normal EMG report was directly forwarded by Attorney Nardone to Kirk Space as part of his May 15, 1997 submission, along with permission for Erie to review the first-party file for the November 1990 accident. (Space trial testimony, and P-53 and D-8.) The 1992 abnormal EMG report had been included in the April 1, 1996 submission of Attorney Nardone. (P-11, D-5; Nardone trial testimony.)

(105) Mr. Space acknowledged that an EMG is an objective test that cannot be faked. (Space trial testimony.)

(106) Erie's witnesses at trial could not point to any evidence of any intervening event (aside from the June 8, 1992 accident) between the December 1991 normal EMG and the August 1992 abnormal EMG that could

account for the abnormal findings after the June 1992 accident. (See Kranyecz trial testimony, Matta trial testimony.)

(107) Faced with the new information provided in the May 1997 correspondence, and uncontradicted information from plaintiff's supervisor concerning her difficulties performing the functions of the position, it was unreasonable for Erie to maintain an evaluation of $30,000 for the underinsured claim.

(108) No Erie employee involved in the handling of Jean Hollock's UIM claim adjusted the April 3, 1996 reserve of $30,000 following receipt of the following new information which was not available at the time the file's only evaluation report was completed:

(a) January 15, 1997 report of Dr. Kammen;

(b) Trial testimony transcript of Dr. Frank O'Brien;

(c) Report of Allstate Insurance Company's independent medical examining orthopod, Dr. Alice Coyle;

(d) Trial testimony of Dr. Alice Coyle;

(e) Letter of Deborah Durland;

(f) Updated vocation report of Mark Lucas. (P-39.) (P-115, Space depo. pp. 120-27.)

(109) Erie did not obtain a vocational expert until nearly one and one half years later, on August 18, 1998 (William Walker). (P-171.)

(110) The court finds that Mr. Space's May 12, 1997 letter was a ruse to allow Erie time to place Ms. Hollock under surveillance and to have the entire claim file submitted to a biomechanical expert, Dr. Rink, to challenge causation of plaintiff's injuries, despite the fact that Erie, as the first-party carrier responsible for paying plaintiff's

medical bills related to the accident, had already acknowledged the causal connection of those injuries to the June 8, 1992 accident. (P-46, P-50.) *This is the fifth objective illustration of Erie's disingenuous attempt to handle Ms. Hollock's UIM claim.*

(111) As of May 12, 1997, Kirk Space had no medical data, literature or reference material from any source whatsoever that indicated Jean Hollock was faking the injuries for which her UIM claim was made. (P-115, Space, p. 189.)

(112) Prior to May 14, 1997, Erie only challenged the reasonableness and necessity of Jean Hollock's post accident chiropractic treatment and did not challenge the remainder of Ms. Hollock's medical bills and conceded those bills were causally related to the June 8, 1992 motor vehicle accident, including the April 1993 surgery (ulnar nerve transposition) and period of total disability following said surgery. (P-115, Space, p. 196.) Despite the fact that Mr. Space knew that Erie was paying Ms. Hollock's medical bills as being causally related to the June 1992 accident, Mr. Space decided to challenge causation for those same injuries in the UM claim. (Space trial testimony.)

(113) Whether considering medical payments, wage loss payments or underinsured payments, these would all be first-party benefits to Erie's insured. (Kranyecz trial testimony; Matta trial testimony.) This court finds that the inconsistent positions taken with respect to payment of Ms. Hollock's first-party benefits as being causally related to the accident on one hand, and on the other hand disputing the causal nexus of this treatment for purposes of the UIM claim is clear and convincing evi-

dence of Erie's self-interest and bad faith. (Space, Kranyecz, Matta, Hosfield and Barnett trial testimony.)

(114) Erie provided no rational, reasonable or credible explanation for why Erie, as first-party carrier, was not challenging causation as to the injuries suffered in the June 8, 1992 accident, including the right radial nerve injury and April 1993 surgery and period of total disability following the surgery, subsequent medical treatment for the right radial nerve injury, and psychological overlay, while Erie, as the UIM carrier, was challenging causation. (See trial testimony of Debbie Matta; trial testimony of Donna Hosfield; trial testimony of Kirk Space.)

(115) While Erie's first-party adjuster, Donna Hosfield, did challenge causation of certain medical bills apparently submitted to the first-party carrier in error for diagnoses such as bills for cornea problems, ear problems, gastroenteritis, by sending these bills back to Ms. Hollock's counsel with correspondence indicating they did not appear causally related, Erie's first-party department did not do so with regard to the medical bills relating to the treatment Ms. Hollock underwent for her cervical or right radial nerve injury. Rather, Erie's first-party adjuster continued to pay those bills despite knowing that her condition was "permanent," that Ms. Hollock was in her late 40s and was suffering from significant residual injuries, and as of October 3, 1995, was wearing a cervical collar and wrist splint. (Hosfield trial testimony.)

(116) The court rejects Erie's contention that Erie's reason for not contesting the first-party medical bills or wage loss as being a "business decision" as not credible. Although Erie believed it was "cost-effective" to do a

$450 peer review on the chiropractic bills of Dr. Thomas totaling approximately $1,300, Erie also claims that it did not challenge Ms. Hollock's subsequent first-party medical bills on causation since it was not "cost-effective," despite the fact that these medical bills totaled approximately $12,000 as of April 1996, and included a surgical procedure, as well as first-party wage loss, and ongoing medical treatment for an injury that was "permanent." (Hosfield trial testimony.)

(117) Upon receipt of plaintiff's demand for $450,000 in May 1997, Erie intentionally began a course of action aimed at challenging the causation of plaintiff's injuries.

(118) After receiving plaintiff's $450,000 demand in May 1997, despite payment of first-party medical benefits by Erie, Erie began a course of action in the underinsured claim attempting to challenge causation of the injuries (including the surgery of April 1993) and question the severity of the injuries relative to the June 1992 accident. The court specifically finds that this course of conduct was above and beyond the course of conduct already taken by Kirk Space as set forth in previous findings.

(119) On May 14, 1997, Kirk Space, at the suggestion of his supervisor, Joseph Kranyecz, referred Jean Hollock's UIM claim to Erie's investigative services section representative to conduct pre-surveillance and surveillance on Jean Hollock despite having no evidence that Jean Hollock was presenting a fraudulent claim. (P-116, Kranyecz, p. 113; Kirk Space trial testimony.)

(120) In conducting the surveillance, Mr. Bradshaw used proper and lawful investigative techniques and did not trespass on Hollock's property, observing her exclu-

sively in public places, such as when Hollock entered and exited her car parked on the public street or outside her place of employment.

(121) Bradshaw obtained two brief segments of videotape of Hollock during the surveillance, amounting to approximately two to three minutes running time.

(122) By late August 1997, the surveillance had not produced any information to prove or disprove that Hollock actually had the physical disabilities she claimed, and the matter was closed.

(123) In his final report to Erie dated September 5, 1997, Bradshaw concluded that Hollock did not appear to have any disabilities that were outwardly displayed. (D-2, Tab 102.)

(124) Despite spot checks and 15 and one-half hours of surveillance on Jean Hollock between June 6, 1997, and August 7, 1997, there was absolutely nothing in the surveillance notes or surveillance films which indicated Jean Hollock was engaged in any physical activities that were inconsistent with her claim of accident-related injuries and resultant disabilities. (P-116, Kranyecz, p. 118; trial testimony of Kranyecz, Space and Bradshaw; P-126 and P-127.)

(125) On May 19, 1997, Erie forwarded the file to Richard Rink, a biomechanical specialist, with the intention of challenging causation for the injuries suffered in the June 1992 accident, despite the fact that Erie was paying the medical bills on the first-party claim.

(126) In May 1997, after receiving the demand letter, rather than retaining a physician to perform a medical examination, Erie retained a biomechanical expert, Dr. Rink, to determine "if motions of Ms. Hollock's right

upper extremity during the accident would cause injury to the ulnar and radial nerves resulting in cubital tunnel syndrome and radial sensory neuropathy." (P-136, exhibit Y p. 3.)

(127) Dr. Rink is not a medical doctor, and is not qualified to render medical opinions. (See Space trial testimony.) On June 20, 1997, Erie received the biomechanical report of Richard Rink, wherein he opined that there was no mechanism in the June 1992 accident to subject the ulnar nerve to damage in the region of the cubital tunnel or elsewhere, and none of the upper extremity motions would pose a threat of injury to the superficial radial nerve. (P-61; Space trial testimony.)

(128) Dr. Rink either ignored, or was not provided by Erie, with all pertinent information relative to his analysis concerning the mechanism of plaintiff's injuries. Dr. Rink was not provided with photographs of both vehicles involved in the 1990 accident or the 1992 accident. Dr. Rink was not provided with the damage estimate for the other vehicles involved in the 1990 and 1992 accidents. Dr. Rink's report dated June 17, 1997, does not mention the December 1991 normal EMG which clearly establishes that plaintiff's ulnar and radial nerve injury did not exist prior to the June 1992 accident. Dr. Rink does not directly mention the August 1992 EMG studies which were proven evidence that Ms. Hollock had ulnar and radial neuropathy. Dr. Rink gives passing reference to Dr. O'Brien's interpretation of EMGs as demonstrating cubital tunnel syndrome, but indicates the date of the studies as June 18, 1992, when no studies were conducted on that date. Since Dr. Rink did not have, or chose to ignore, the December 1991 normal EMG, there is no

comparison in his report to the pre-accident and post-accident EMGs. (P-136 and Kirk Space trial testimony.)

(129) The court finds it disturbing that Dr. Rink arbitrarily rejects Jean Hollock's history of injury that she was grabbing the steering wheel at the time of her accident, in order to reach his conclusion that the June 1992 accident could not have produced her injury.

(130) After receiving Dr. Rink's report, Kirk Space determined that it would be appropriate to make his "best offer" at $30,000, which is the exact amount of his reserve and evaluation in April 1996, prior to receiving Dr. Rink's report. (See P-61 and P-12.) Kirk Space then extended his "best offer" to settle the claim in the amount of $30,000 on July 14, 1997. (P-66.) (Space trial testimony.)

(131) On July 14, 1997, Erie extended a verbal settlement offer in the amount of $30,000, which was immediately rejected by plaintiff's counsel who then made a formal demand for arbitration, together with placing Erie on notice of its bad faith conduct. (P-66; trial testimony of Space and Nardone.) Kirk Space initially testified in plaintiff's case in chief, that he could not recall whether he told Attorney Nardone in July of 1997 that he had obtained a biomechanical expert; in his testimony as part of defendant's case, he testified that he did tell Attorney Nardone in the July 14, 1997 conversation that he had retained a biomechanical expert, despite the fact that this is not contained in his July 14, 1997 entry. (Space trial testimony.) This court accepts the testimony of Attorney Nardone that the report of Dr. Rink was not provided to him until shortly before the September 4, 1998 arbitra-

tion. (Nardone trial testimony.) This court accepts as credible the testimony of Attorney Nardone that Kirk Space did not articulate any reasons for his $30,000 offer in July 1997. (Nardone trial testimony.)

(132) The only settlement offer ever made by Erie to Jean Hollock to resolve her UIM claim prior to the October 16, 1998 arbitration award was that which was made verbally by Kirk Space to Jean Hollock's counsel, Attorney John Nardone, on July 14, 1997, in the amount of $30,000, the exact figure the claim had been reserved at since April 3, 1996. (Trial testimony of Space and Nardone.)

(133) Erie had an obligation to negotiate the claim in good faith, independent of any demand by plaintiff's counsel and independent of any actions by the third-party carrier, Allstate. (Space trial testimony.)

(134) After plaintiff's counsel demanded arbitration on July 14, 1997, Erie assigned Attorney Robert Panowicz to handle the underinsured claim. (P-68, P-69; Panowicz trial testimony.)

(135) In an attempt to now justify its $30,000 offer, defendant retained three additional expert witnesses: Dr. Richard I. Katz, a neurologist (who examined plaintiff on June 9, 1998); Dr. Gladys Fenichel, a psychiatrist (who examined plaintiff on August 31, 1998); and William Walker C.R.C., a vocational analyst (who evaluated plaintiff on August 18, 1998).

(136) Erie retained an IME physician, Dr. Katz, in June 1998. At the time Dr. Katz performed his neurological evaluation on June 16, 1998, Erie had not provided him with a single medical record or any documents concerning plaintiff's job duties, despite the fact that Erie had

all of plaintiff's medical records, supplied by plaintiff's counsel in April 1996, May 1997 and those independently gathered by Erie's counsel through authorizations prior to the June 1998 IME. (See P-136, exhibit Z.)

(137) In his June 16, 1998 report, without the benefit of a single medical record or documents indicating the plaintiff's job duties, Dr. Katz arrived at the conclusion that plaintiff's complaints to the ulnar nerve were attributable to her "long-standing secretarial duties," and that her April 1993 surgery was not related to the 1992 accident. The only mention in Dr. Katz's June 16, 1998 report concerning plaintiff's job duties is "she has been doing secretarial or related work for some 25 years and continues to work on a regular basis." (P-136, exhibit Z.)

(138) After already committing himself to opinions without the benefit of a single record, Dr. Katz subsequently was provided with medical records on June 18, 1998, by Erie's counsel, and generated a second report. (P-136, exhibit Z.)

(139) In the report of vocational expert William Walker dated August 18, 1998, he does not calculate any wage losses with regard to the paralegal specialist position, nor does he take into account any productivity increases. (P-136, exhibit AA.) Even Walker acknowledges over $86,000 in wage losses. Even after receiving Walker's report, Mr. Space did not change his $30,000 evaluation. (Space trial testimony.)

(140) The plaintiff's underinsured motorist claim proceeded to arbitration on September 3, 1996, resulting in a gross arbitration of $865,000. (Jointly agreed upon stipulation no. 10.)

(141) Defendant was entitled to a credit in the amount of $100,000, representing the amount of insurance coverage available to the tort-feasor in the third-party claim. Accordingly, the net amount of the arbitration award was $265,000 in excess of the $500,000 underinsured coverage provided under the Erie policy.

(142) Defendant filed a petition to modify the arbitrator's award and to confirm the modified award and enter judgment. On November 13, 1998, the Honorable Michael T. Conahan of the Luzerne County Court of Common Pleas entered an order modifying the award to $500,000, reflecting the full amount of the underinsured coverage available to plaintiff.

(143) It is undisputed that Erie promptly paid Hollock the UIM policy limits of $500,000 in response to the arbitration award without appealing or otherwise contesting that award, except for the modification as set forth above.

(144) On April 3, 1996, Erie had established a reserve of $30,000 on the underinsured claim (meaning a gross value of $130,000 due to the tort-feasor setoff), which it maintained throughout the pendency of the claim. Erie established this reserve despite the fact that liability was not an issue and there was no comparative negligence reduction; Erie had paid over $12,000 in medical bills on the first-party claim; plaintiff had undergone surgery and was disabled for six weeks, with Erie making a first-party wage loss claim of $1,500; and Erie had not contacted plaintiff's counsel and obtained a demand, or spoken with the insured or taking the insured's statement or IME prior to establishing this reserve. Erie failed to ever increase its reserve or settlement offer, in complete dis-

regard of subsequent medical reports, vocational reports and other documentation (including an updated vocational report with future lost wages as high as $524,799). Thus, throughout the pendency of the underinsured claim, Erie's evaluation of the total value of this claim (with the $100,000 tort-feasor credit) was $30,000.

(145) The Hollock UIM claim was converted to a home office file in April of 1996. (Trial testimony of Scott Brown.) Per Mr. Ludrof, a case which is converted to home office is typically a claim of "great significance." (Ludrof trial testimony.)

(146) There is no reasonable basis for the $30,000 reserve. (See Barnett trial testimony.) The $30,000 reserve was not reasonable and was reckless in light of the following: (1) clear liability; (2) where the plaintiff had surgery and was still treating four years after the accident with confirmation from her supervisor of the difficulties she was having performing her work; (3) the projections for lost earning potential and corroboration of the causal relationship and residual problems by her treating physicians as well as the Allstate IME physician, Dr. Coyle. (See Barnett trial testimony.)

(147) This court finds that Erie, through Kirk Space, came to an evaluation of this claim in April 1996, without the benefit of any medical, vocational or expert opinions, and thereafter engaged in a covert effort to justify their pre-determined, unfounded conclusion concerning the value of the case.

(148) Any claim by Erie that it "relied" on medical opinions as a basis for their April 3, 1996 evaluation and $30,000 reserve or the July 14, 1997 $30,000 offer is not credible given that Erie did not obtain any examinations

of the plaintiff until the June 16, 1998 IME of Dr. Katz, the August 1998 IME of Dr. Fenichel and the August 1998 vocational assessment of Mr. Walker.

(149) Ms. Hollock never made a claim for injury to the right ulnar nerve as a result of the 1990 accident. (Nardone trial testimony, and P-174, same as D-34 and D-37.)

(150) Attorney Nardone settled the November 1990 accident case for $35,000. (Nardone trial testimony.)

(151) Throughout the entire Hollock UIM claim, her counsel, Attorney Nardone provided all information and documents requested by Erie. (Space and Nardone trial testimony.)

(152) In October 1999, plaintiff filed this action alleging Erie acted in bad faith, inter alia, by refusing, without legal justification or cause, to promptly, fairly and objectively evaluate her underinsured motorist claim; failing to negotiate in good faith; failing to pay her in a timely fashion all the monies due for damages she suffered as a result of the accident; unreasonably and dilatorily handling the underinsured motorist claim; and failing to effectuate a prompt and equitable resolution. Defendant filed an answer and new matter to this complaint. In its new matter, Erie claims that "defendant's conduct was reasonable, appropriate and justified at all relevant times." (New matter, paragraph 62.)

(153) Through the testimony of Erie witnesses, plaintiff has proven by clear and convincing evidence that Erie engaged in a pattern of deliberate indifference to the rights of its policyholder, including multiple instances of contradictory and incredulous testimony concerning Erie's policies, procedures and guidelines by high-rank-

ing Erie executives. Although Erie had multiple individuals involved in the Hollock claim at both the branch and home office levels, Erie's representatives demonstrated a lack of supervisory guidance and complete denial of accountability for the handling of the Hollock claim, including, inter alia:

(a) Despite the fact that Mr. Vehec was the direct supervisor of Debbie Matta (home office claims examiner), he could not say whether she had an independent responsibility to review the reserves periodically once the file was converted to home office. (Vehec trial testimony.)

(b) Per Scott Brown, Joe Kranyecz and Kirk Space, Erie had a duty to comply with Erie's policies and procedures. Mr. Brown, as home office claims examiner, denied he had a duty to ensure that Mr. Kranyecz and Mr. Space were complying with Erie's policies, despite the fact that home office maintained an open file on the Hollock UIM claim from April 4, 1996, throughout the time of the September 1998 arbitration. (Brown trial testimony.)

(c) Mr. Brown, home office claims examiner, did not know the supervisor's guidelines for review of reserves. (Brown trial testimony.)

(d) Mr. Brown, despite being home office claims examiner on the Hollock file from April 4, 1996, through February 3, 1997, did not suggest that Mr. Space meet with the insured, take an exam under oath, arrange for an IME, obtain photos of both vehicles, check with the insurer for the third-party tort-feasor, Allstate, for their evaluation, or call claimant's attorney. (Brown trial testimony.)

(e) Despite suggesting that Erie's fraud unit (ISS unit) become involved on May 14, 1997, and that surveillance be conducted (P-48), Mr. Kranyecz was not aware of Erie's written policy concerning when surveillance should be used. Nor was he aware the Erie policy required the presence of certain "fraud indicators" before surveillance could be used. (Kranyecz trial testimony.)

(f) Per Mr. Brown, Erie had a guideline that the adjuster was to review the reserve every 90 days and enter a separate CMS file note documenting the reserve review, and if Mr. Space was not doing so, this would not be in accord with Erie's guidelines. (Brown trial testimony.) Mr. Space admitted that he had not entered a separate CMS file note documenting his reserve review, but claimed that per his "diary" notes (P-95), that each time the file came up on diary, he would have reviewed the file and reserves, but never entered a separate CMS file entry reflecting that review. This court rejects Mr. Space's testimony that he reviewed the file and reserve each time the matter came up on diary, contrary to Erie's own policies and procedures. (See Space trial testimony.)

(g) Despite assuming responsibility of the Hollock UIM claim as of February 3, 1997, Home Office Claims Examiner Deborah Matta did not author any CMS notes concerning the Hollock claim until July 28, 1997. (Matta trial testimony.) Nonetheless, she testified at trial that per her "diary" system, she would have reviewed the file each time the file came up on diary, but never entered a corresponding CMS note reflecting that review. Ms. Matta could not indicate what specific dates she reviewed the file from February 3, 1997 to July 28, 1997. Throughout her testimony, Ms. Matta relied upon extensive hand-

written notes in an attempt to justify Erie's actions on the Hollock UIM claim.

(h) Despite acknowledging Erie's policy on reserving is to set the reserve for the amount of the ultimate value on the claim, Mr. Young believed that a $30,000 reserve which Erie established, and never changed, on the Hollock UIM claim two and one-half years prior to an arbitration award of $865,000 was adequate and good faith reserving. (Young trial testimony.)

(i) At the time of trial, Mr. Space testified that he believed that the $30,000 reserve was adequate, even in light of the $865,000 arbitration award, in direct contradiction to his sworn deposition testimony, at page 172, where he admitted that the $30,000 reserve was grossly inadequate in terms of the $865,000 arbitration award. (Space trial testimony.)

(j) In his deposition testimony, at page 137, Mr. Space acknowledged that he had no evidence to contradict Mr. Lukas' projections as of receipt of the May 7, 1997 demand letter. At trial, Mr. Space offered a host of reasons why he contradicted Mr. Lukas' projections, which he testified was simply "elaborating" on his earlier deposition testimony. When asked by the court to explain the contradiction, he could not do so. (Space trial testimony.)

(k) From April 1997 until May of 1997, Mr. Kranyecz did not tell Mr. Space to meet Ms. Hollock, conduct an IME, examination under oath, obtain medical authorizations, contact the third-party carrier, or obtain photographs of both vehicles, despite his admission that nothing prohibited him from doing so and despite Erie's own guideline recommending those important investigative steps be taken. (Kranyecz trial testimony.)

(l) Prior to signing the evaluation report on April 8, 1996, Kirk Space's supervisor, Joseph Kranyecz, did not independently review the file to determine whether the information contained in the evaluation report completed by Mr. Space was correct or complete. (Kranyecz trial testimony.)

(m) Mr. Kranyecz did not enter a CMS note indicating he reviewed reserves every 90 days. (Kranyecz trial testimony.) Mr. Kranyecz contended that each time the file came up on diary he would have reviewed the reserves, but admitted that since no CMS note was entered, no one would know that he did so. (Kranyecz trial testimony.)

(n) Mr. Kranyecz requested an updated evaluation report be done by Mr. Space on May 14, 1997. When asked to explain why he would have requested an evaluation report be updated if Mr. Space's May 9, 1997 CMS notes were sufficient as an updated evaluation (as contended in Mr. Space's testimony), Mr. Kranyecz could not explain this discrepancy.

(o) When asked why he would be asking in his May 14, 1997 note to Mr. Space if Attorney Nardone had made a demand if he had read the May 9, 1997 CMS note of Kirk Space summarizing the demand, Mr. Kranyecz testified "obviously I missed it." (Kranyecz trial testimony.)

(p) Mr. Kranyecz admitted that if there was a change in the information contained on the prior evaluation report, he wanted Mr. Space to do an evaluation report on the formal form provided by Erie; by Mr. Space's own admission, no new formal evaluation report was ever done. (Kranyecz trial testimony.)

(q) Mr. Kranyecz's suggestion on May 14, 1997, that Mr. Space obtain the performance evaluations from Ms. Hollock's supervisor was never followed by Mr. Space. (Kranyecz trial testimony.)

(r) When asked why his August 21, 1997 CMS note included a suggestion that Kirk Space request Attorney Nardone provide an authorization to review the first-party file when Attorney Nardone had already provided the authorization on April 1, 1996, he testified "I missed it." (Kranyecz trial testimony and P-73.)

(s) After Mr. Kranyecz requested Mr. Space update the evaluation and reserve in his August 21, 1997 note, and Mr. Space responded by saying there was nothing new to add and that the evaluation report was "concurrent" with the information in the file, Mr. Kranyecz did not check the file to determine the obvious incorrectness of these statements. (Kranyecz trial testimony and P-74.)

(t) Despite Kirk Space's request on June 20, 1997, and again on July 7, 1997, for Mr. Kranyecz's input before making an offer of settlement, Mr. Kranyecz admitted there was no CMS note responding to Mr. Space's request before Mr. Space made the $30,000 offer on July 14, 1997, *despite the fact that Mr. Space admitted he only had up to $1,000 in authority and needed supervisory approval for amounts above $1,000.* (Kranyecz trial testimony and P-64 and 61; Kirk Space trial testimony in defendant's case in chief, cross-examination.)

(u) When asked to explain his October 1, 1997 claims note (P-80) wherein Mr. Kranyecz asked Kirk Space for his thoughts on retaining a biomechanical engineer given the extensive injuries and minimal damage, when in fact Mr. Kranyecz was the one who made the suggestion to

retain a biomechanical engineer in May 1997, Mr. Kranyecz responded "I missed it." (Kranyecz trial testimony and P-80.) As of October 1, 1997, it was apparent that Mr. Kranyecz had not gone back and looked on his earlier notes or checked the reserve or evaluation report.

(154) Immediately prior to and during the trial of this matter, Erie continued to exhibit reckless indifference to the rights of its policyholder, Jean Hollock, including, inter alia, the following:

(a) Erie's senior vice president of claims, Jeffrey Ludrof, testified without reviewing a single document including any part of the claim file, prior to his court testimony. (Ludrof trial testimony.) It is evident to the court that his failure to review any documents was done deliberately, in an attempt to feign ignorance and avoid giving any meaningful testimony.

(b) Michael Vehec, Erie's manager of litigation and claims examination, had not reviewed the Hollock UIM claim to determine whether the steps in plaintiff's exhibit 99d had been followed. Nor did he discuss the file with Mr. Space to determine if the file had been handled in good faith. (Vehec trial testimony.)

(c) Scott Brown, Erie home office claims examiner, initially testified that the only document he reviewed prior to trial was his deposition transcript. He later testified that he also reviewed his CMS notes, but did not review anyone else's CMS notes, saying he did "not want to confuse his memory." (Brown trial testimony.)

(d) Prior to testifying at trial, despite knowing that he would be testifying about the handling of the Hollock UIM claim, Mr. Brown chose not to review the Hollock file to determine whether the Hollock claim had been

handled in good faith, or whether the Erie guidelines were followed. (Brown trial testimony.)

(e) Despite knowing he was being called to testify at trial, Charles Young, who was branch manager during the Hollock UIM claim, never reviewed the Hollock file before his trial testimony. Following the $865,000 award, he reviewed a couple screens on the computer and spoke with Joe Kranyecz for 10-15 minutes. (Young trial testimony.)

(f) Despite inquiry by the court at a pretrial conference on November 28, 2001 as to settlement, at no time from the pretrial conference up to and including the conclusion of the trial on December 19, 2001, did Erie make any overtures or attempts toward settlement of the within claim, other than a general indication that Erie may be willing to pay "cost of defense."

(155) This court finds, based on the totality of testimony at trial from Erie's representatives, that Erie engaged in a deliberate attempt, both in the depositions and in their trial testimony, to obfuscate the issues at trial, including evading answers to questions, deliberately failing to review documents and file materials in order to feign ignorance, contradicting their sworn deposition testimony, and providing testimony that defies logic and credibility.

(156) On multiple occasions during his trial testimony, Kirk Space was confronted with his sworn deposition testimony (taken just six months earlier) which contradicted his trial testimony, which is profoundly disturbing and troubling to the court. Further, when called on direct examination in defendant's case in chief, after sitting throughout the entire trial as Erie's corporate desig-

nee and hearing the questions and answers of all witnesses, Kirk Space almost magically was able to expound upon and/or answer questions previously asked of him in plaintiff's case to which he had little or no response. Kirk Space's conduct in the litigation of the Hollock UIM claim, including the failure to disclose the correct amount of coverage when directly requested to do so, began a pattern of dishonesty which permeated the trial. This court finds the legal maxim "falso in uno, falso in omnibus" to apply to Kirk Space's testimony, and discredits Kirk Space's testimony for that reason.

(157) The arrogance exhibited by Mr. Space during his testimony is more than unsettling. We find the conduct of Erie, vis-à-vis this claim, to be more than benign neglect. Erie's conduct in handling this claim ranged from intentional indifference to conscious efforts in an attempt to justify earlier misconduct.

(158) With regard to this particular claim, the credible evidence portrays Erie as a company run amuck. Erie employees present a company in which the employees are isolated with discrete functions, limited responsibility, and limited coordination. While there are certainly layers of supervision and a distinct chain of command, the evidence establishes very little in the way of close scrutiny or supervision of important decisions.

(159) The record establishes that, in the context of this case, oversight is a meaningless word.

(160) Erie's documentation of this file is not only woefully inadequate to support the trial testimony, it clearly, in our judgment, is in direct contravention to the guidelines authored, in part, to avoid bad faith claims. The irony is apparent to any objective observer.

(161) No amount of semantic straining, verbal jousting, or obfuscation of the issues can mask the truth: Erie acted in bad faith toward Jean Hollock.

(162) Plaintiff's bad faith claim was previously being handled by Patrick Dougherty, Esquire. Subsequently, Timothy G. Lenahan, Esquire entered his appearance as counsel for plaintiff.

(163) Plaintiff has submitted as trial exhibits the attorneys' fees itemization for the attorney time expended by John Nardone, Esq., in pursuing the underinsured motorist claim as a result of Erie's unreasonable refusal to settle, as well as the attorney time expended by Patrick Dougherty, Esq., and Lenahan & Dempsey P.C., in pursuing the instant bad faith claim as follows, which this court accepts as reasonable. (See exhibits P-140 through P-143.) These fees are as follows:

(1) John Nardone, Esquire
Attorney itemization for pursuing
underinsured claim
05/01/97 to 01/12/99 (P-140)
(44.1 hours x $225 per hour)     *$  9,922.50*

(2) John Nardone, Esquire
Attorney itemization for bad faith claim
02/01 /99 to 11/08/00 (P-141)
(9.1 hours x $225 per hour)     *$  2,047.50*

(3) Patrick Dougherty, Esquire
Attorney itemization for bad faith claim
04/01/99 to 01/31/01
(49.20 hours x $150 per hour)
claim 4/1/99 to 1/31/01 (P-142)     *$  7,380.00*

(4) Lenahan & Dempsey P.C.
Attorney itemization for bad
faith claim (P-143)
(808.80 hours)                                   *$143,602.50*

| | |
|---|---|
| *Total Attorneys' Fees* | *$162,952.50* |

(1) *Costs incurred in pursuing underinsured claim—*
*John Nardone, Esquire*

| | | |
|---|---|---|
| Conrad Falvello, Esquire (Arbitrator's fee) $3,000 | $ | 3,000.00 |
| Joseph Burke, Esquire (Arbitrator's fee) | $ | 1,750.00 |
| Northeast Rehabilitation Associates —Medical records & reports 6/18/98 | $ | 250.00 |
| Carl R. Augustine (EUO—Jean Hollock) 6/12/98 | $ | 181.50 |
| HCC Corporation (Medical records) 6/24/98 | $ | 119.29 |
| Luzerne County Prothonotary (Filing fee—petition to appoint arbitrators) 9/19/97 | $ | 50.50 |
| Luzerne County Sheriff/Service (Petition to appoint arbitrators 9/19/97) | $ | 29.00 |
| Lehigh County Sheriff (Service—petition to appoint arbitrators 9/19/97) | $ | 31.00 |
| Erie Insurance Group (Records) 6/19/98 | $ | 26.30 |
| John Heinz Institute (Records) 6/24/98 | $ | 21.00 |
| Oral Surgery Associations (Medical records) 7/16/98 | $ | 20.00 |
| Frank O'Brien M.D. (Medical records) 6/24/98 | $ | 5.00 |
| Sub-Total Costs—Underinsured Motorist | $ | 5,483.59 |

(Amount stipulated by defendants)
See plaintiff's exhibit P-139.

(2) *Costs incurred in bad faith claim (Patrick Dougherty, Esquire)*

| | | |
|---|---|---|
| Luzerne County Prothonotary (Filing fee—bad faith complaint) | $ | 82.00 |
| Luzerne County Sheriff (Service fee—bad faith complaint) | $ | 42.00 |
| Lehigh County Sheriff (Service fee—bad faith complaint) | $ | 50.00 |
| Sub-Total Costs (Patrick Dougherty, Esquire) | $ | 174.00 |

See P-142.

(3) *Costs incurred in bad faith claim (Lenahan & Dempsey P.C.)*

| | |
|---|---|
| Subtotal Costs per Itemization (P-143) | $ 30,143.81 |
| *Total Costs Incurred In Underinsured And Bad Faith Claim* | *$ 35,803.40* |

(164) This court accepts the testimony of plaintiff's expert, Jonathan Cunitz, regarding the interest lost as a result of Erie's bad faith conduct, see P-124, and awards plaintiff interest as follows:

| | |
|---|---|
| Interest lost on $450,000 demand 5/7/97 to 11/24/98 | $ 80,072.00 |

(165) This court accepts the unrefuted expert testimony of Jonathan Cunitz regarding the analysis of Erie's financial worth, relative to the punitive damage issue. (P-124.) Based on his analysis, Erie's net income ranged from $122.7 to $306.6 million during the past five years, and averaged $219.3 million per year. Moreover, Erie's surplus increased from $2.3 billion in 1996 to $4.8 billion in 1999.

(166) This court accepts as credible Jonathan Cunitz's estimates that 10 percent of Erie's net worth (which is

only 1/2 percent of the company's surplus as of 2000), would be a figure which would not hamper Erie's operations.

(167) Per Dr. Cunitz's testimony, "surplus" is the "net worth" of an insurance company, using the conservative statutory accounting method of the state insurance department by subtracting assets from liabilities. (Cunitz trial testimony.)

(168) Erie's net income has fluctuated in amounts greater than 10 percent from 1996 through 2000, and Erie remains a viable, operating entity. (Cunitz trial testimony.)

(169) Erie paid the $500,000 policy limits on November 24, 1998, over two and one-half years after being placed on notice of the underinsured claim.

## II. *Conclusions of Law*

(1) The instant complaint is brought pursuant to 42 Pa.C.S. §8371, arising from the bad faith conduct of Erie in handling the underlying underinsured motorist claim of Jean Hollock.

(2) Section 8371 creates a statutory remedy for bad faith conduct of insurers. If it is determined that an insurer has acted in bad faith, the insured is entitled to an award of interest on the amount of the claim from the date the claim was made, punitive damages, and court costs and attorney's fees against the insurer. 42 Pa.C.S. §8371.

(3) Bad faith on the part of an insurer is any frivolous or unfounded refusal to pay proceeds of a policy. *Terletsky v. Prudential Property & Casualty Insurance Co.,* 437 Pa. Super. 108, 649 A.2d 680 (1994). Bad faith exists

where the insurer "did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." *MGA Insurance Co. v. Bakos,* 699 A.2d 751, 754 (Pa. Super. 1997); *Terletsky, supra.*

(4) Plaintiff must prove bad faith through clear and convincing evidence, by showing that: (1) the insurer did not have a reasonable basis for denying benefits under the policy and (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Terletsky, supra.*

(5) The "clear and convincing" standard is the highest burden in civil law, and it requires proof so clear, direct, weighty, and convincing that the fact-finder is able to come to clear conviction, without hesitancy, of the truth of the precise fact at issue.

(6) The court may look to the following sources in determining whether an insurer has acted in bad faith under section 8371:

(A) Other cases construing the statute and the law of bad faith in general;

(B) The plain meaning of the terms and the statute; and/or

(C) Other statutes addressing the same or similar subjects. *Romano v. Nationwide Mutual Fire Insurance Co.,* 435 Pa. Super. 545, 646 A.2d 1228 (1994). See also, *MGA Insurance, supra.*

(7) Pennsylvania has at least two statutes, as well as regulations, which govern an insurer's conduct toward an insured. These include the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 et seq.; the

Unfair Insurance Practices Act, 40 P.S. §1171 et seq.; and the Pennsylvania Code regulations for unfair insurance practices, 31 Pa. Code §146.1 et seq.

(8) Under the Unfair Insurance Practices Act, 40 P.S. §1171.4, the following acts by an insurer constitute an "unfair method of competition or any unfair or deceptive act or practice in the business of insurance":

"(10) (i) Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue;

"(ii) Failing to acknowledge and act promptly upon written or oral communications with respect to claims arising under insurance policies;

"(iii) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

"(iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information; . . .

"(vi) Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims in which the company's liability under the policy has become reasonably clear;

"(vii) Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.

"(viii) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; . . .

"(xii) Delaying the investigation or payment of claims by requiring the insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; . . .

"(xiv) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; . . . ." 40 P.S. §1171.5

(9) Pursuant to the Unfair Insurance Practices provision in the Pennsylvania Code, 31 Pa. Code §146.1 et seq., the following provisions apply to this claim:

"146.4 Misrepresentation of policy provisions

"(a) An insurer or agent may not fail to fully disclose to first-party claimants pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented;

"(b) An insurer or agent may not fail to fully disclose to first-party claimants benefits, coverages or other provisions of an insurance policy or insurance contract when the benefits, coverages or other provisions are pertinent to a claim; . . . ."

(10) Pursuant to 31 Pa. Code §146.6, "Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed with the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected."

(11) Pursuant to the Consumer Protection Law, 73 P.S. §201-2, it is an unfair method of competition or unfair or deceptive act or practice to engage in "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. §201-2(4)(xxi).

(12) The purpose of UIM coverage is to protect the insured from the risk that a negligent driver of another vehicle will cause injury to the insured and will have inadequate liability coverage to compensate for the injuries caused by his negligence.

(13) If the tort-feasor's liability coverage is sufficient to make the insured whole, there is no valid UIM claim by definition.

(14) The Pennsylvania Supreme Court has long held that an insurer must act with the "utmost good faith" towards its insured. *Fedas v. Insurance Co. of PA,* 300 Pa. 555, 151 A. 285 (1930); *Romano v. Nationwide,* 435 Pa. Super. 545, 646 A.2d 1228 (1994).

(15) On February 7, 1990, the Pennsylvania General Assembly created a statutory remedy for the bad faith conduct of insurers, 42 Pa.C.S. §8371. Bad faith is not defined in section 8371.

(16) In *Terletsky v. Prudential Property & Casualty Ins. Co., supra,* the Superior Court clarified the meaning of bad faith as follows:

" 'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair deal-

ing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith." *Id.* at 125, 649 A.2d at 688, citing Black's Law Dictionary 139 (6th ed. 1990).

(17) Bad faith conduct by an insurer may include, inter alia, (1) unreasonable delay in handling claims; (2) inadequate investigation; (3) or failure to make reasonable offer of settlement.

(18) Bad faith can extend to conduct by the insurer during the litigation of the bad faith claim itself. *O'Donnell v. Allstate Insurance Co.,* 734 A.2d 901 (Pa. Super. 1999).

(19) An insurer's bad faith conduct can include unreasonable delay in handling claims. *Ania v. Allstate,* 161 F. Supp. 424 (E.D. Pa. May 30, 2001) (citing cases); *Wood v. Allstate,* 1997 U.S. Dist. Lexis 14663 (1997) (jury could find the insurer acted in bad faith in refusing to pay underinsured benefits until nearly two years after plaintiff's accident, and approximately one and one-half years after receiving notice of the underinsured claim); *Kraeger v. Nationwide,* 1996 U.S. Dist. Lexis 18373 (E.D. Pa. 1996) (jury could find bad faith existed where an insurer did not take any action for 10 months after receiving notice of an underinsured claim, despite fact that carrier ultimately tendered policy limits).

(20) Although delay can be a relevant factor in determining whether bad faith has occurred, even a long period of time between demand and settlement does not, on its own, constitute bad faith.

(21) Erie had an unequivocal right to investigate Hollock's UIM claim, rather than simply accepting Hollock's say-so as to the nature or value of the claim.

(22) An insurer's investigation can be inadequate with respect to its selection of the IME physician and what it elected to give him, by selecting the physician without examining his neutrality, by failing to check his credentials, and by failing to determine whether the physician had a complete understanding of the plaintiff's occupation. *Greco v. Paul Revere,* 1999 U.S. Dist. Lexis 110 (E.D. Pa. January 12, 1999).

(23) An insurer can breach its duty of good faith by not performing a good faith evaluation of its chances for a successful defense at trial, which must include a thorough evaluation, the range of possible adverse verdicts, the strengths and weaknesses of all the evidence, the history of similar cases within the forum, and the appearance, persuasiveness and likely appeal of the claimant and witnesses at trial, contradictory expert testimony, and advice of its counsel predicting the chances of an excess verdict. *Birth Center v. St. Paul Companies Inc.,* 727 A.2d 1144 (Pa. Super. 1999). See also, *Kraeger v. Nationwide, supra.; Wood v. Allstate, supra.*

(24) An insurer must give the interests of its insured the same faithful consideration that it gives its own interests. *Puritan Ins. Co. v. Canadian Ins. Co.,* 775 F.2d 76 (3d Cir. 1985); *Cowden v. Aetna Casualty & Surety Co.,* 389 Pa. 459, 134 A.2d 223 (1957).

(25) An insurer is not required actively to submerge its own interest in order to benefit the insured. An aggressive defense of the insurer's interest is not bad faith.

(26) Where an insurer's evaluation is "less than honest, intelligent and objective," the insurer can be liable for bad faith. *Puritan, supra.*

(27) An insurer can be found to be bad faith where an insurer attempts to take inconsistent positions when handling the underinsured portions of the claim, as compared to the position taken by that same insurance company on the first-party benefits portion of the claim. *Wood v. Allstate,* 1997 U.S. Dist. Lexis 14663 (1997).

(28) A heightened duty of good faith is necessary in first-party claims due to the special relationship between an insurer and its insured and the very nature of the insurance contract. *Romano v. Nationwide,* 435 Pa. Super. 545, 646 A.2d 1228 (1994).

(29) The insurer's duty of good faith in a first-party claim is contractual and arises because the insurance company assumes a fiduciary status by virtue of the policy provisions which give the insurer the right to handle claims and control settlement. *Gray v. Nationwide Mutual Insurance Co.,* 422 Pa. 500, 223 A.2d 8 (1966); *Romano v. Nationwide, supra.*

(30) Plaintiff has proven by clear and convincing evidence that Erie did not have a reasonable basis for denying plaintiff underinsured benefits under the Erie policy and that Erie knew or recklessly disregarded its lack of a reasonable basis in denying the claim. *Terletsky v. Prudential,* 437 Pa. Super. 108, 649 A.2d 680 (1994).

(31) Erie was motivated by self-interest or ill will in the handling of the plaintiff's UIM claim. *Terletsky v. Prudential,* 437 Pa. Super. 108, 649 A.2d 680 (1994).

(32) As part of the underinsured claim, Erie defended the claim by challenging the causation and severity of Jean Hollock's injuries. Erie's defense in that regard was reckless and lacked a reasonable basis, inter alia, since:

(1) Erie, as the first-party carrier, recognized and paid the medical bills as being related to the June 1992 accident, including the medical bills and wage loss stemming from the April 1993 ulnar transposition surgery. At no time did Erie ever challenge the medical bills in the first-party claim as not being causally related to the accident. The only medical bills challenged were those for chiropractic treatment by virtue of a peer review, on the grounds that the same were not reasonable or necessary, but not on causal relationship. Erie did, however, refuse to pay certain bills relating to x-rays of the sacroiliac joint, injury to the cornea, ear infection, gastroenteritis, cornea, calluses, and constipation, which were apparently sent to Erie in error.

(2) Erie's file contains only one evaluation report dated April 3, 1996, in which Erie adjuster Kirk Space states the injuries were "cervical and right trapezius strain, right cubital tunnel syndrome with right radial sensory neuropathy. Prognosis guarded." (P-12.) He further states "insured was rear-ended in a prior accident on November 28, 1990, wherein she incurred right side neck, trapezius and right hand pain. It is felt that the June 1992 accident aggravated pre-existing conditions *but that the cubital tunnel syndrome was primarily the result of the second accident.*" (P-12.) This evaluation report was never amended in any way, nor any new evaluation reports issued, throughout the pendency of the UIM claim. Kirk Space acknowledged at the time he generated this evaluation report he was agreeing to causation and accepting Dr. O'Brien's causation opinion for the right ulnar nerve surgery.

(3) The objective EMG studies prior to the June 1992 accident taken on December 11, 1991, were normal (P-128; P-136, exhibit A); however, the EMG studies taken on August 25, 1992, showed ulnar neuropathy as well as mild radial sensory neuropathy at the wrist level. (P-129; P-136, exhibit E.) Erie had no evidence of any intervening events to explain the positive EMG in August 1992 other than the June 1992 accident.

(33) Without holding that Erie necessarily violated 73 P.S. §201-2, this court does find that Erie engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding by: (1) representing to Attorney Nardone on May 12, 1997, that Erie needed time to get a second vocational opinion in May of 1997, when in fact Erie had no intention of doing so at that time as evidenced by the May 11, 1997 claims note (and which was not obtained until August of 1998). Instead Erie attempted to challenge causation and perform surveillance; and (2) performing surveillance and never disclosing this to the insured or the arbitrators.

(34) This court accepts as credible the expert opinions as testified to by plaintiff's expert, Peter Barnett, Esquire (P-122) with regard to the bad faith conduct exhibited by Erie in the instant case, including:

(a) The $30,000 reserve was grossly inadequate;

(b) The reserve was not regularly reviewed, either by the claims handler or supervisor;

(c) No meaningful offer was ever made to settle;

(d) There is evidence in the Erie claims handling that import dishonest purpose and motives of self-interest and ill will, including looking for ways to avoid having to pay Jean Hollock following receipt of the May 7, 1997

demand, and placing its own financial interest over the legitimate health interest of its own policyholder, and using surveillance on plaintiff when there was no legitimate basis for the same;

(e) Erie failed to conduct a meaningful investigation into the worth of the Hollock claim for five years following the accident;

(f) Erie had no reasonable basis for not settling the UIM claim;

(g) Any experienced claims person would have and should have realized the value of the claim was near, or in excess, of the policy limit; Erie knew and/or recklessly regarded that the value was in excess of $500,000, particularly when litigated in a UIM forum;

(h) Erie's adjusters and supervisors either did not know, deliberately ignored, or misunderstood Erie's claims handling guidelines and expectations, which recognize and emphasize the need for regular and recurrent file reviews to substantiate the basis for decisions to deny or limit payment on a claim.

(35) Erie's assertion that plaintiff's injuries were not causally related to the accident was unfounded and an ill-motivated attempt to justify its conduct, including, but not limited to, the setting of the $30,000 reserve.

(36) Erie acted recklessly and without a reasonable basis in evaluating the value of plaintiff's claim, since Erie failed to evaluate its chances for a successful defense at arbitration, which must include a thorough evaluation, the range of possible adverse verdicts, the strengths and weaknesses of all the evidence, the history of similar cases within the forum, and the appearance, persuasiveness and likely appeal of the claimant and witnesses

at trial, contradictory expert testimony and advice of its counsel. *Birth Center v. St. Paul Companies Inc.*, 727 A.2d 1144 (Pa. Super. 1999). See also, *Kraeger v. Nationwide, supra.; Wood v. Allstate, supra.*

(37) Plaintiff has established by clear and convincing evidence that Erie recklessly embarked on a course to deny plaintiff her due compensation, without a reasonable basis.

(38) Plaintiff has proven by clear and convincing evidence that Erie failed to investigate plaintiff's claim within a reasonable time frame. Erie conducted no meaningful investigation of plaintiff's claims between March 8, 1996 and May 1, 1997, including failure to request a face to face interview, examination under oath, medical authorizations, or independent medical examinations. Erie's delay in investigating this claim is without reasonable or rational explanation and contrary to the provisions of 31 Pa. Code § 146.6, which requires an insurer to *complete* investigation of a claim within 30 days after notification, unless the investigation cannot reasonably be completed within the time. In that case, however, the insurer must notify the claimant every 45 days thereafter with a reasonable written explanation for the delay and state when a decision on the claim may be expected. It is uncontradicted that Erie did not complete its investigation in 30 days, nor did Erie notify Jean Hollock or her counsel every 45 days of the status of its investigation and when a decision may be expected.

(39) This court finds that Erie's investigation of the Hollock UIM claim was inadequate, and did not form a reasonable basis for Erie's evaluation, reserve and settlement offer which remained the same from April 3, 1996,

throughout the arbitration award on October 16, 1998, since, inter alia:

(a) Mr. Space did not request photographs of the other vehicle involved in the Hollock accident, nor did he know what amount of property damage was done to the other vehicle. (Space trial testimony.)

(b) From March 8, 1996 until April 3, 1996, Mr. Space did not request Mr. Nardone's opinion on value, the condition of the insured, details of injuries or for a demand, nor did he contact Allstate regarding their opinion on value, saying what Allstate paid or what Allstate did or did not do made no difference to his handling of the UIM claim. (Space trial testimony.)

(c) From March 8, 1996 until April of 1997, other than obtaining the police report and reviewing the property damage aspect of the claim, and reviewing the information provided by Attorney Nardone in April 1996, Kirk Space did not perform any independent investigation of the UIM claim since he "saw no point" in doing so. He did not request to meet Jean Hollock, and never met her prior to the arbitration. He did not request a statement from her. He did not request an examination under oath until May of 1998. He did not request an IME until June 1998 and August 1998. Nor did he request medical authorizations until September 1997. (Space trial testimony.)

(d) Despite recognizing the importance of determining the insured's appearance to evaluate the claim, Mr. Space never requested a face to face meeting with Ms. Hollock from March 5, 1996, until the arbitration on September 4, 1998. (Space trial testimony.)

(e) Mr. Space failed to contact Ms. Hollock's employer, contrary to his supervisor's suggestion, to obtain her performance evaluations, despite the fact that the wage loss projections exceeded $200,000.

(40) Erie's delay in investigation from March of 1996 to May of 1997 was motivated by its own self-interest, in the hopes that the third-party verdict would come back at a low figure, in order to avoid having to pay underinsured benefits all together.

(41) Without holding that Erie necessarily violated 40 P.S. §1171.5(10)(iii), this court does find that Erie failed to promptly investigate this claim.

(42) Without holding that Erie necessarily violated 31 Pa. Code §146.6 and 40 P.S. §1171.5(10)(iii), this court does hold that Erie failed to request medical authorizations between March 1996 and September 1997.

(43) Without holding that Erie necessarily violated 40 P.S. §1171.5(10)(xii), this court does hold that Erie's counsel's request that plaintiff sign medical authorizations in December 1997 delayed the investigation or payment of the claim by requiring the insured to make submissions which contain substantially the same information, since the same medical records were already in possession of Erie through submissions from John Nardone and Erie's first-party benefits file.

(44) Without holding that Erie necessarily violated the Unfair Insurance Practices Act, 40 P.S. §471.5(10)(i) (relating to misrepresenting pertinent facts of contract provisions relating to coverages), or the Unfair Claims Settlement Practices, 31 Pa. Code §146.4(a) and (b) (by failing to fully disclose pertinent benefits, coverages, or other provisions of an insurance policy or insurance con-

tract under which a claim is presented), or the Consumer Protection Law, 73 P.S. §201-2(4)(xxi) (relating to any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding) this court does hold that Kirk Space's willful, deliberate and intentional conduct of failing to disclose the correct underinsurance coverage of $500,000 after receiving Attorney Nardone's March 5, 1996 correspondence enclosing an incorrect declaration sheet, and by failing to respond to Attorney Nardone's April 1, 1996 request for confirmation of the correct UIM coverage, is outrageous conduct done with a bad motive and with a reckless indifference to the interest of Jean Hollock.

(45) By failing to advise Attorney Nardone of the correct underinsured coverage as of March 8, 1996, Mr. Space's conduct also violates Erie's own claims handling policies, including claims-handling expectations, coverage expectations (P-97b) which requires that the adjuster, in the *initial* contact with the policyholder to discuss all coverages applicable to a claim, and then document this discussion in the claims file. (P-97 and 97b.)

(46) The testimony of Kirk Space, that he apparently did not believe that he had any duty to immediately correct misapprehensions of coverage, is contrary to the insurance statutes and regulations governing their conduct, and contrary to Erie's own guidelines, and simply incredible.

(47) Without holding that Erie necessarily violated 31 Pa. Code §146.5, which requires "an appropriate reply shall be made within 10 working days on other pertinent communications from a claimant which reasonably suggest that a response is expected," this court does hold

that Erie failed to directly respond to John Nardone's inquiry on March 5, 1996, and April 1, 1996, as to whether Erie would agree to be bound by the verdict in *Hollock v. DiGennari,* and is additional evidence of bad faith.

(48) Erie's decision to require its policyholder to litigate the third-party action, only to have to relitigate the damages issue in the arbitration if Erie decided that the third-party verdict was too high such that it did not want to honor the verdict, is contrary to the spirit of 40 P.S. §1171.5(10)(vii), by compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons. This conduct is also contrary to (xi), which prohibits making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants to induce or compel them to accept settlements or compromises less than the amount awarded in arbitration. Thirdly, it is contrary to 73 P.S. §201-2(xxi), since Erie engaged in deceptive conduct which created a likelihood of confusion or misunderstanding by not advising Attorney Nardone of its intentions whether or not it would honor the third-party verdict.

(49) Erie's decision to "wait and see" what happened in the third-party trial is evidence of bad faith since Erie placed its own self-interests ahead of its insured. Erie's decision to take no action on the UIM claim, hoping to force its insured to trial on the third-party claim first, and then face a separate arbitration on the UIM claim unless Erie was satisfied that the third-party verdict suited its own interests, lacked a rational or reasonable basis

based on the trial testimony, and was made in bad faith since Erie failed to accord the interests of its insured the same faithful consideration that it gave its own. *Bracciale v. Nationwide,* 1993 U.S. Dist. Lexis 11606 (E.D. Pa. 1993), citing *Puritan Insurance v. Canadian Universal,* 775 F.2d 76 (3d Cir. 1985); *Polselli v. Nationwide,* 23 F.3d 747 (3d Cir. 1994).

(50) Plaintiff has proven by clear and convincing evidence that Erie failed to make a reasonable offer of settlement and failed to attempt in good faith to effectuate prompt, fair and equitable settlement of a claim in which Erie's liability had become reasonably clear. Plaintiff has also proven by clear and convincing evidence that Erie compelled plaintiff to institute litigation to recover amounts due under the insurance policy by compelling plaintiff to institute litigation to recover amounts due under an insurance policy by offering substantially less than amounts due and ultimately recovered by plaintiff in arbitration. Erie's $30,000 settlement offer was unreasonable and reckless in light of all of the circumstances and information available to Erie. By failing to make a reasonable settlement offer, Erie forced plaintiff to arbitrate the underinsured claim.

(51) Erie's evaluation of this case at $30,000 was not an honest, intelligent and objective one in light of all of the available information.

(52) This court finds that Erie's evaluation and reserve of the Hollock claim at $30,000 (gross value of $130,000) on April 3, 1996, was unreasonable, reckless, and in disregard of clear and uncontradicted evidence in Erie's possession as of April 3, 1996, including, inter alia:

(a) At the time of his April 3, 1996 evaluation, Mr. Space had no medical records to indicate that the right ulnar nerve injury, including the April 1993 surgery, and other injuries, including the cubital tunnel syndrome, and aggravation of cervical injuries, were related to anything other than the June 8, 1992 accident and the injuries claimed by Ms. Hollock. He also had an April 13, 1993 report of Dr. O'Brien addressed to Erie's first-party file that corroborated a causal relationship. (Space trial testimony.) Assuming Mr. Space was accepting the causal relationship as of April 3, 1996, based upon his trial testimony, no reasonable claims adjuster could have believed that the claim had a gross value of $130,000, since the special damages alone contained in Mr. Space's evaluation report totaled over $80,000, including a surgery, with additional damages not considered by Mr. Space totaling between $103,540 and $192,050;

(b) Mr. Space admitted that, "depending on the person reading it," his CMS notes and evaluation report discussing the reports of Mark Lukas could be misleading since Mr. Lukas' reports used different numbers than those contained in Mr. Space's notes and Mr. Space did not give any explanation for how he arrived at his figures. (Space trial testimony.)

(c) When asked what numbers he used to arrive at his gross evaluation of $130,000, Mr. Space could only point to the out of pocket losses of $40,000 in his evaluation report, and the rest is based on his "experience." (Space trial testimony.)

(d) Mr. Kranyecz was asked by the court to explain what factors were considered by Erie in establishing a reserve. Although he initially testified venue was a fac-

tor, he could not explain how Luzerne County venue would have factored into the reserve. He identified forum as a factor, and that arbitration awards are typically higher than jury awards in his experience. He could not identify any other factors considered in setting the reserve, other than the experience of the adjuster. (Kranyecz trial testimony.)

(e) Mr. Space acknowledged that his rationale for arriving at the $30,000 reserve and settlement offer was not contained in his CMS notes, contrary to the requirements of the Commonwealth auditors regarding documenting claims files. (Space trial testimony.)

(f) Although Debbie Matta identified various factors which she believed may have been used by Kirk Space, she did not provide any competent testimony as to how Kirk Space in fact arrived at his reserve in April of 1996. (Matta trial testimony.)

(g) Erie, as first-party carrier, acknowledged the causal relationship of the right ulnar nerve injury, surgery and period of total disability following said surgery, as well as the other injuries.

(53) Plaintiff has established by clear and convincing evidence that Erie's evaluation of plaintiff's claim was less than honest, intelligent and objective. The $30,000 reserve and settlement figure established by Mr. Space in his April 3, 1996 evaluation report was patently inadequate. Based on the documentation received prior to generating the April 3, 1996 evaluation, an honest and realistic claims adjuster would have recognized that the claim had the potential to exceed the $500,000 policy limits. The initial evaluation by Mr. Space was reckless, and was not an honest, intelligent and objective evalua-

tion of Ms. Hollock's injuries and Erie's potential exposure, as required under 42 Pa.C.S. §8371.

(54) As of April 1996, Erie should have posted a more realistic reserve, and should have made sincere efforts to settle the claim in a fair and equitable manner. (Barnett trial testimony.)

(55) In *TDG Partnership v. Regis Insurance Co.,* 43 D.&C.4th 169, 175 (Chester Cty. 1999), the court found bad faith on the part of the insurer, where among other things, "the objective and verifiable information in the defendant's possession mandated the conclusion that the plaintiffs were entitled to the limits of this particular coverage." Here, Erie chose to ignore clear, objective evidence, which clearly established that Erie's liability to pay this claim was clear, including the December 11, 1991 normal EMG prior to the June 1992 accident and the August 28, 1992 abnormal EMG subsequent to the June 1992 accident, which demonstrated objective, electromyographic evidence of an ulnar and radial neuropathy which did not exist prior to the June 1992 accident. Here, the "objective" information was the EMGs. The "verifiable" information relating to Ms. Hollock's future lost wages and impaired earning capacity was a phone call to the Social Security Administration (Debbie Durland), which Kirk Space chose not to make despite a directive from his supervisor that he do so. Erie intentionally disregarded this *undisputed* and *objective* evidence of plaintiff's injuries in evaluating this claim.

(56) This court rejects Erie's claim that there was a valid issue of "causation." In fact, Erie's own "insurance expert," Dr. Kensicki, repeatedly conceded in his testimony that "causation was never an issue." Thus, even

Erie's *own* expert contradicts, Erie's *purported* "reasonable" basis for its evaluation.

(57) The expert reports of Dr. Rink and Dr. Katz are of de minimis value to this court's determination as to the reasonableness of Erie's evaluation of the Hollock UIM claim, since the credible testimony of record indicates that Erie arrived at their evaluation of this claim prior to receipt of the reports of Dr. Rink and Dr. Katz, and did not rely upon Dr. Rink or Dr. Katz in their evaluation of this claim. Erie's retention of Dr. Rink and Dr. Katz was nothing more than an attempt to legitimize the $30,000 reserve Erie had already set.

(58) Erie evaluated the case at $130,000 in April 1996. Dr. Rink was not retained until May 1997. Dr. Katz was not retained until June 1998. Mr. Walker's evaluation was conducted two weeks before the arbitration hearing. Dr. Fenichel examined Ms. Hollock three weeks before the hearing but did not generate a report until four days beforehand. Erie's attempt to rely on reports and opinions obtained two years after the determination was made is disingenuous and is nothing more than a miserable attempt to cover up and conceal its earlier misconduct. This court finds, based on the totality of the credible evidence, that Erie did not rely upon Dr. Rink and/ or Dr. Katz in reaching their evaluation and making the $30,000 settlement offer. The issue of alleged reliance upon Dr. Rink and Dr. Katz is an example of bad faith in and of itself, since not only did Kirk Space admit in his trial testimony that he did not rely upon them, but the court believes based on the only evaluation report of record, which remained the same before and after obtaining Dr. Rink and Dr. Katz's opinions, that Erie *in*

*fact* did not rely upon these experts and therefore cannot claim "good faith" reliance. Therefore, Erie lacked a reasonable basis to evaluate the plaintiff's UIM claim at $30,000, both before and after receipt of the expert reports of Dr. Rink and Dr. Katz, as well as the subsequent reports of Dr. Fenichel and Mr. Walker.

(59) Further, this court finds that Erie's purported reliance on the June 17, 1997 biomechanical report of Dr. Rink on the issue of causation was profoundly misplaced and could not have formed a reasonable basis to support Erie's otherwise unexplainable settlement offer of $30,000 on July 14, 1997, because, inter alia:

(a) Pennsylvania law, on the ability of biomechanical experts to provide competent testimony, is questionable at best. See *Collins v. Cooper,* 746 A.2d 615 (Pa. Super. 2000);

(b) Dr. Rink was not a medical doctor, and absent such qualifications, his opinion on causation is questionable; Erie could not reasonably rely on Dr. Rink to deny causation for Ms. Hollock's injuries;

(c) Dr. Rink, who is not a medical doctor, *completely disregarded* the medical opinions Dr. Thomas, Dr. O'Brien and Dr. Coyle;

(d) Although he did review Ms. Hollock's deposition transcript, only a few pages were devoted to the mechanism of injury. *Erie did not request Ms. Hollock provide a statement (either in the form of a statement under oath or recorded statement or informal face to face meeting) concerning the mechanism of accident to Erie which would have provided an adequate foundation for Dr. Rink to perform his analysis;*

(e) At the same time that Erie was requesting review by Dr. Rink, and had received Rink's report to challenge causation, Erie, as first-party carrier, was paying, and continued to pay, Ms. Hollock's medical bills as being causally related to the June 1992 motor vehicle accident;

(f) Either Erie apparently chose not to provide Dr. Rink with the December 1991 EMG report and August 1992 EMG report, or Dr. Rink chose to ignore these objective studies, which Erie knew and recklessly allowed. Either one of these scenarios is evidence of bad faith, since Erie either failed to provide complete evidence to its expert, or allowed its expert to issue a report based on less than all available information;

(g) Dr. Rink ignored medical histories and testimony concerning the mechanism of injury and made a credibility determination that discounted Ms. Hollock's version of the accident which Dr. Rink, as an expert, had no basis to do; to opine that the mechanics of the June 8, 1992 accident could not cause the ulnar nerve damage, Dr. Rink had to discredit, without any substantiation whatsoever, the history Jean Hollock gave in her deposition testimony and the history she gave to Dr. Coyle, the IME physician, that she forcefully grabbed the steering wheel with her right hand during the June 8, 1992 accident impact;

(h) In order to reach his conclusion on causation, Dr. Rink had to specifically ignore, discount and/or engage in a contorted analysis of the medical opinions of Dr. O'Brien and Dr. Coyle, both of whom concluded to reasonable medical certainty that there was but one cause of the right ulnar nerve injury, namely, the June 8, 1992 accident;

(i) Dr. Rink did not provide any explanation for the etiology of Ms. Hollock's right ulnar nerve injury, which was *objectively* demonstrated on the August 1992 EMG report; Erie knew that there was objective evidence of an injury to Ms. Hollock's ulnar nerve that did not exist as of the time of the December 1991 EMG, and that there was no indication that Ms. Hollock suffered any intervening trauma between the December 1991 and August 1992 EMG reports other than the June 1992 accident. It was therefore unreasonable for Erie to rely on the speculative assertions of Dr. Rink discounting Ms. Hollock's version of the accident *without any contrary information as to the mechanism of injury,* since Erie had already received objective evidence via the August 1992 EMG, and that *there was no other incident that Erie (or Dr. Rink) could have relied upon as being the cause of the objective abnormality;*

(j) Dr. Rink was not provided, and did not independently request photos of all vehicles involved in the November 28, 1990 and June 8, 1992 accidents. (Even if Dr. Rink made this request Erie could not have complied as its adjuster failed to obtain these photos as part of his investigation.)

(k) Dr. Rink was not made aware, or chose to ignore, the *uncontradicted and unchallenged* information from plaintiff's supervisor, Debbie Durland, that plaintiff's difficulties performing her job duties manifested after the June 1992 accident; *Greco v. Paul Revere,* 1999 U.S. Dist. Lexis 110 (E.D. Pa. January 12, 1999).

(60) The court further finds that the July 14, 1997 settlement offer made to plaintiff was unreasonable, reckless, and in disregard of clear and uncontradicted evi-

dence in Erie's possession as of April 3, 1996, including, inter alia:

(a) As of the time Kirk Space made his July 14, 1997 settlement offer of $30,000, Mr. Space had no *medical* information to say that the right ulnar nerve injury and surgery was related to anything other than the June 8, 1992 accident. (Space trial testimony.)

(b) As of the time of his July 14, 1997 offer, Kirk Space had uncontradicted evidence from Ms. Hollock's supervisor, Debbie Durland, that Ms. Hollock was having difficulties at work which were preventing her from advancing in her work and, more importantly, that those difficulties arose after the June 8, 1992 accident;

(c) As of the time of the July 14, 1997 offer (or thereafter), Mr. Space intentionally refused to meet with Ms. Hollock to assess her credibility or appearance before the arbitration panel;

(d) As of the time of the July 14, 1997 offer, Kirk Space had *uncontradicted medical* evidence of Dr. O'Brien, as well as Dr. Coyle, the IME physician for the tort-feasor's insurance carrier, Allstate, that corroborated the causal nexus of Ms. Hollock's right ulnar nerve injury and permanent disabilities. The significance of Dr. Coyle's deposition is self-evident;

(e) If in fact Dr. Rink's evaluation played any role in Erie's position as of July 14, 1997, Erie may well have reduced its reserve from the $30,000 figure which had been established in April 1996. Specifically, Kirk Space testified that in performing his April 1996 evaluation and reaching his $30,000 reserve, he accepted causation for Ms. Hollock's injuries, including the surgery to her right ulnar nerve. Kirk Space would ask this court to believe

that, in April 1996, with a mountain of uncontradicted evidence supportive of Jean Hollock's injuries as being causally related to the June 8, 1992 accident, and with a minimum of $80,000 in special damages and future lost earning projections at nearly $200,000, he fairly and honestly evaluated the plaintiff's claim at $130,000. Kirk Space would further ask this court to believe that, after receiving Dr. Rink's report in June of 1997 which indicated that the June 1992 accident did not cause Ms. Hollock's injuries, *he believed the Hollock claim had the exact same value of $130,000.* In other words, to believe Kirk Space's testimony, the court must accept that Ms. Hollock's claim had the exact same value *with* causation as *without* causation. This court finds Erie's tortured logic and explanation totally implausible.

(61) This court specifically finds Erie's purported reliance on the June 16, 1998 and June 18, 1998 reports of Dr. Katz to be patently unreasonable, in bad faith, and demonstrative of a knowing and reckless disregard for its lack of a reasonable basis to deny the Hollock UIM claim for the following reasons:

(a) In his June 16, 1998 report, Dr. Katz renders an opinion on causation without having reviewed a single Hollock medical record or diagnostic test result;

(b) Even after providing medical records to Dr. Katz, based on a thorough review of Dr. Katz's report, Erie either deliberately chose not to provide the reports of plaintiff's supervisor, Debbie Durland, to Dr. Katz, or Dr. Katz chose to ignore them, which Erie would know would be an incomplete report;

(c) Jean Hollock gave virtually the identical history to Dr. Katz on June 16, 1998, that she had given to Dr.

O'Brien and Dr. Coyle to explain how she injured the right ulnar nerve when she grabbed the steering wheel during the June 8, 1992 accident and yet Dr. Katz inexplicably discounts the June 8, 1992 trauma as the causative agent in producing the Hollock injuries and instead suggests, without any foundation, that Ms. Hollock's work as a secretary may have been the culprit;

(d) Dr. Katz's conclusions that Ms. Hollock's injuries may be related to her 20 years of secretarial work appear to be unsubstantiated by any evidence that indicates that Ms. Hollock was experiencing any difficulties at work prior to the June 8, 1992 accident. Indeed, Dr. Katz's conclusions are directly contrary to the *uncontradicted* reports of plaintiff's supervisor, Debbie Durland, that plaintiff's difficulties began after the June 8, 1992 accident;

(e) Dr. Katz's conclusions that the findings on the August 1992 EMG could be attributable to Ms. Hollock's 20 years of secretarial work appear to be without adequate foundation, since there is no indication in his report (which is the only evidence Erie submitted at the arbitration) that Dr. Katz had been provided with any information concerning the specific duties of plaintiff's positions over that 20-year period, and therefore there is no indication that Dr. Katz had an accurate or complete understanding of her job duties. It is bad faith for an insurer to claim to rely on an IME physician where the insurer failed to provide him all proper documents relative to his determination and failed to determine whether the physician had a complete understanding of the plaintiff's occupation. *Greco v. Paul Revere, supra;*

(f) In his supplemental report of June 18, 1998, Dr. Katz, inter alia, compares the normal results of the December 26, 1991 EMG/NCS (P-128) with the abnormal/positive EMG/NCS done approximately two months following the June 1992 accident (P-129) and vaguely suggests (in a nearly incomprehensible sentence) that in spite of those results Ms. Hollock's secretarial work may have been the cause of the difference in the results. The court questions how Mr. Space can accept as credible Dr. Katz's findings that work as a secretary for 19 years would produce a normal EMG/NCS, and yet work as a secretary for 19 years, nine months, would produce an abnormal EMG/NCS (particularly when there has been an intervening traumatic event);

(g) Dr. Katz's conclusions ignore the well-established principle that a defendant (here Erie) takes the plaintiff as it finds her, and if the incident aggravated a prior condition, or caused an asymptomatic condition to become symptomatic, the defendant is responsible for that injury;

(h) At the same time that Erie was seeking and purportedly relying upon the IME findings of Dr. Katz, Erie was paying, and continued to pay, Ms. Hollock's first-party medical benefits;

(i) Dr. Katz expressed the incredible position that Ms. Hollock had no residuals of her injury, in contrast with the findings of Dr. O'Brien and Dr. Coyle regarding the loss of strength and permanent residual disability;

(j) Erie, through its counsel, scheduled the trial deposition of Dr. Katz on May 12, 1998, *before* Dr. Katz had even conducted his exam or reviewed a single record. This court is most troubled by what can only be inter-

preted as the exact opposite of the normal course of litigation, namely, doing an IME, obtaining a report, and only then scheduling the doctor to testify if his findings support the defense theory; as a consequence, this court finds merit to plaintiff's contention that the true "independence" and "unbiased" nature of Dr. Katz's findings could and should be severely scrutinized.

(62) Erie's contention that its adjuster may, in essence, blindly rely on the findings of a biomechanical and/or neurological expert (and ignore a mountain of contrary information) to irrefutably prove that it had a reasonable basis to deny payment to Jean Hollock is unreasonable and without merit. To carry Erie's position to its logical end, Erie could obtain an expert opinion that the sky is green (knowing it is not) and then hide behind that ridiculous opinion to defend that which is otherwise indefensible. For this court to embrace Erie's position would require a complete emasculation of section 8371 as well as a disregard of the spirit and intent of the statute. That is something this court simply cannot and will not do.

(63) This court accepts the circumstantial evidence adduced at trial which question the impartiality of Dr. Katz, and Dr. Fenichel *i.e.,* their defense orientation, a factor to be considered in determining Erie's bad faith. *Greco, supra,* including:

(a) This court accepts as credible the trial testimony of Attorney Nardone that in every file he has been involved in, either as counsel or arbitrator, Dr. Katz has been an expert for the defendant;

(b) This court accepts as credible the testimony of John Nardone that Dr. Fenichel, Erie's psychiatric IME, who provided a report one week before the arbitration, is also

located in Philadelphia and travels throughout Northeastern Pennsylvania at the request of defendants and insurance companies to perform examinations, and every case he has been in with her she has been an expert for the defense. (Nardone trial testimony.)

(c) Dr. Katz's trial testimony was scheduled on May 12, 1998, for July 20, 1998, by Attorney Panowicz, even before he had the IME report to know what his findings would be.

(64) With regard to William Walker, his analysis contains the critical flaw of basing Ms. Hollock's future impaired earning capacity, as it relates to the promotions within the Social Security Administration, on a static figure. Although he acknowledges the differential between the GS-7 and GS-8 positions at $4,955, he projects that figure through normal retirement age of 65 or a period of an additional 16 years. (Walker report, p. 8.) In fact, the salary for the position was a GS-8 for only one to two years and then the salary for the position continued to increase up to the GS-10 level. These are the figures reflected in plaintiff's exhibit to the arbitration brief. Erie had been provided with the government pay scale information as part of the May 7, 1997 demand letter, and either Erie knew that William Walker's analysis was flawed, or recklessly disregarded whether his analysis was accurate.

(65) Based upon the credible evidence of record, this court finds that Erie did not have a reasonable basis to evaluate plaintiff's claim at $30,000 and knew or recklessly disregarded its lack of a reasonable basis. *Terletsky, supra.*

(66) Without holding that Erie necessarily *violated 40* P.S. §1171.5(10)(vi), this court does hold that Erie did not attempt in good faith to effectuate a prompt, fair and equitable settlement of Ms. Hollock's claim when the company's liability under the policy became reasonably clear.

(67) Upon receipt of the $450,000 demand, rather than attempting to fairly and in good faith conduct negotiations with plaintiff, Erie engaged in an adversarial plan to attack and undermine their own policyholder. Erie began a deliberate course of conduct designed to deny plaintiff the underinsured benefits for which she had paid premiums under her policy, including conducting surveillance despite the absence of any indication of fraud. Erie challenged causation of plaintiff's injuries despite Erie's payment of medical bills and lost wages as the first-party carrier. Erie made misrepresentations regarding its intentions, including advising plaintiff's counsel in May of 1997 that it was obtaining a second vocational opinion when it had no intention of doing so at that point but instead engaged in surveillance and retained a biomechanical expert to challenge causation.

(68) An insurer's inconsistent positions with respect to handling of the first-party and underinsured portions of the claim is evidence of bad faith. *Wood v. Allstate, supra.* The fact that Erie paid the plaintiff's medical bills and wage losses, including the medical bills and wage losses relative to the April 1993 ulnar surgery, as part of the first-party claim, and then proceeded to challenge causation on the underinsured claim, is evidence of Erie's bad faith conduct. Although Erie contended that its first-party benefits department needed "good cause" and/or a

court order to challenge causation, Erie's own policy (P-2) gives Erie the right to insist upon an IME, including for first-party medical benefits, and no "good cause" need be shown. *Fleming v. CNA Insurance Companies,* 409 Pa. Super. 285, 597 A.2d 1206 (1991). Had Erie chosen to challenge the first-party medical benefits on causation, Erie simply could request that Ms. Hollock voluntarily undergo an IME; under the terms of the Erie policy, Ms. Hollock must do so or risk having Erie deny coverage for failure to cooperate. (P-2, p. 10.) The fact that Erie, as first-party carrier, chose not to challenge causation for Ms. Hollock's medical bills for the same injuries which Erie, as UIM carrier, was challenging causation, is evidence of Erie's bad faith conduct, since the same insurance carrier, for the same insured, for the same accident, for the same injuries, arrived at inconsistent conclusions for the same medical treatment. Based on the totality of the evidence presented at trial, the court finds that Erie miserably failed to provide a single credible reason for the inconsistency between the handling causation issue as between the first-party and UIM claims. (See Matta, Space and Kranyecz trial testimony.)

(69) Under the Pennsylvania Unfair Insurance Practices Act, which this court can look to in making the bad faith determination, an insurer commits an unfair claim settlement practice by compelling a person to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons. Erie's conduct in offering $30,000 as its only settlement offer is evidence of bad faith in light of the $865,000 arbitration award. The net arbitration award of $765,000 is over 25 times the amount offered by Erie.

While mere differences in value do not constitute bad faith, where an arbitration award is over $730,000 greater than Erie's highest offer, the court finds this is evidence of bad faith.

(70) Erie established the "top" value of this case in April of 1996, within one month of receiving the claim, and never changed that value despite receiving substantial evidence after that time that should have caused Erie to increase its evaluation. Erie never re-reviewed the reserves or never performed an updated evaluation, in violation of Erie's own policies requiring the reserves be regularly monitored, reviewed, and updated upon receipt of new information. (P-97, EIHOL 2278, 2282; P-98, 2305, 2310, 2313; P-99, EIHOL 2535, 2536, 2541-2542; 99c, EIHOL 2629, 2630; OO, 2559-2560; P-106, EIHOL 2629, 2630.)

(71) Erie recklessly and deliberately ignored new information that had a profound and substantial effect on the value of the claim.

(72) Plaintiff established by clear and convincing evidence that Erie failed to fairly and objectively evaluate plaintiff's claim for underinsured motorist coverage. Erie made a "low ball" offer of settlement of $30,000, and chose to deliberately ignore uncontradicted evidence, and the weight of contradicted evidence, in evaluating this claim. Faced with projected future wage losses/loss of earning capacity in excess of $500,000, as well as an unsuccessful surgery with permanent residual limitations, Erie chose to make only one settlement offer of $30,000 and refused to make any additional settlement offers prior to arbitration. By making such an unrealistic and unreasonable settlement offer, and never increasing its offer at

any time, Erie compelled plaintiff to arbitrate this claim, and undergo financial hardship and the emotional and psychological toll of testifying at the arbitration.

(73) The clear and convincing evidence overwhelming establishes that Erie acted in bad faith in violation of 42 Pa.C.S. §8371.

(74) The court rejects the testimony of Erie's expert, Peter Kensicki and finds the rationale for his opinions not supported by evidence of record. Despite being "qualified" to testify as an "expert" under Pennsylvania law, other than his conclusion that causation was not an issue, this court rejects his testimony as biased and less than convincing.

(75) Plaintiff complied with all terms and conditions of the Erie insurance policy and all conditions precedent and subsequent to her right to recover underinsured benefits under the policy.

(76) Pursuant to 42 Pa.C.S. §8371, the following damages are recoverable in a claim for bad faith: (1) interest, at the rate of the prime rate of interest plus 3 percent; (2) punitive damages; and (3) court costs and attorneys' fees.

(77) As a matter of law, Hollock is not entitled to recover any alleged "underpayment" represented by the difference between her Erie UIM policy limits of $500,000 and the original UIM arbitration award of $865,000.

(78) Hollock may not recover any compensatory damages for emotional distress in this action.

(79) Erie's unreasonable settlement offer of $30,000 forced plaintiff to proceed to arbitration and incur unnecessary attorneys' fees, costs, and lost interest.

(80) Pursuant to *O'Donnell v. Allstate,* 734 A.2d 901, 907 (Pa. Super. 1999), "the conduct of an insurer during the pendency of litigation may be considered as evidence of bad faith under section 8371." The court finds that the totality of the deposition and trial testimony of Erie's representatives and conduct at trial is further evidence of bad faith and a continuation of the pattern of Erie's bad faith conduct which began with the handling of Ms. Hollock's UIM claim. The conduct of Erie's representatives at trial, as outlined in the findings of fact above, goes far beyond mere "discovery violations" which the *O'Donnell* court found were not sufficient for bad faith conduct. Erie's conduct in the instant bad faith litigation was an extension of, and compounded, the earlier bad faith committed in the underlying UIM claim. The testimony of most Erie employees (some of whom held positions of considerable importance within the company) is found to be a blatant attempt to undermine the truth-finding process of this court. Moreover, most of the testimony of Erie employees was an intentional attempt to conceal, hide or otherwise cover up the conduct of Erie employees in the handling of the Hollock claim.

(81) 42 Pa.C.S. §8371 allows recovery for attorneys' fees, costs and interest for both the underlying claim under the policy (*i.e.,* here, the underinsured claim), and the bad faith claim. *Birth Center v. St. Paul Companies Inc.,* 727 A.2d 1144 (Pa. Super. 1999); *Polselli v. Nationwide,* 126 F.3d 524 (3d Cir. 1997).

(82) Any award of attorney fees must be reasonable.

(83) When calculating a reasonable award of attorney fees under 42 Pa.C.S. §8371, a trial court must consider the factors set forth in Pa.R.C.P. 1716: "(1) time and effort reasonably expended by the attorney in the litiga-

tion; (2) quality of services rendered; (3) results achieved and benefits conferred upon the class or upon the public; (4) magnitude, complexity and uniqueness of the litigation; and (5) whether the receipt of a fee was contingent upon success." *Birth Center v. St. Paul Companies Inc.,* 727 A.2d 1144 (Pa. Super. 1999).

(84) The calculation of reasonable attorney fees for bad faith by insurer in handling claim should begin with the actual number of hours spent in pursuing the claim multiplied by a reasonable rate; both the number of hours and the rate per hour shall be calculated on a basis reasonably reflective of the relevant market and the magnitude, complexity and uniqueness of the claim and the related task. *Birth Center v. St. Paul Companies Inc.,* 727 A.2d 1144 (Pa. Super. 1999).

(85) This court awards plaintiff interest as follows:
Interest lost on $450,000 demand
5/7/97 to 11/24/98                                                      *$ 80,072.00*

(86) The bad faith statute, 42 Pa.C.S. §8371, specifically provides for punitive damages to be awarded against an insurer for bad faith conduct. 42 Pa.C.S. §8371.

(87) In *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), the Supreme Court adopted section 908(2) of the Restatement (Second) of Torts. Section 908(2) states:

"(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant."

(88) Section 908 sets forth three factors to be considered in awarding punitive damages:

"(1) the character of the act;

"(2) the nature and extent of the harm, and

"(3) the wealth of the defendant." Restatement (Second) of Torts §908.

(89) It is for the trier of fact to weigh these factors in arriving at an appropriate punitive damage award. *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 102, 555 A.2d 800, 803 (1989) (citing Restatement (Second) of Torts §908(2)).

(90) The function of punitive damages is to punish and deter especially egregious behavior.

(91) A company's net worth has been held to be a valid measure of its wealth. *Sprague v. Walter,* 441 Pa. Super. 1, 61, 656 A.2d 890, 920 (1995), citing *W.H. Miner Inc. v. Peerless Equipment Co.,* 115 F.2d 650 (7th Cir. 1940), *cert. denied,* 312 U.S. 687, 61 S.Ct. 615, 85 L.Ed. 1125 (1941) (term "net worth" merely signifies remainder after deduction of liabilities from assets). Compare Black's Law Dictionary 1041 (6th ed. 1990) (net worth is amount by which assets exceed liabilities or the difference between total assets and liabilities of individual, corporation).

(92) Unlike compensatory damages, which have as their purpose the desire to make the plaintiff whole, punitive damages are awarded to punish the wrongdoer and to deter both him and others from engaging in similar conduct in the future. *Sprague, supra; Feingold v. SEPTA,* 512 Pa. 567, 579, 517 A.2d 1270, 1276 (1986); Restatement (Second) of Torts §908, comment a.

(93) Under Pennsylvania law, punitive damages do *not* need to bear a proportional relationship to the compensatory damages awarded in a particular case. *Sprague, supra* at 72, 656 A.2d at 925, citing *Kirkbride v. Libson Inc.,* 521 Pa. at 103-104, 555 A.2d at 803. "Rather, a reasonable relationship must exist between the amount of the punitive damage award and the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant. . . . Our Supreme Court has ruled that a mathematical proportionality requirement between punitive and compensatory damages would actually defeat the purpose of punitive damages, which is to punish tort-feasors for outrageous conduct and deter them and others from similar conduct." *Id.*

(94) An assessment of punitive damages should be significant enough to influence a company to refrain from similar activity in the future, without financially limiting that company's operations.

(95) The court finds that Erie engaged in reckless conduct toward its insured, warranting a punitive damage award. *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 494 A.2d 1088 (1985) (plurality); *SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 587 A.2d 702 (1991). "Reckless indifference to the rights of others" is met where the "actor knows, or has reason to know, . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." *Id.* at 494, 587 A.2d at 704. "Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a *reckless indifference* to

the interests of others." *SHV Coal, supra* at 494, 587 A.2d at 705. (emphasis in original) The case of *Terletsky v. Prudential,* 437 Pa. Super. 108, 649 A.2d 680 (1994) clarified that "to recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Id.* at 125, 649 A.2d at 688. Thus, the standard for punitive damages (reckless indifference to the rights of others) is nearly identical to that required for bad faith, such that reckless behavior sufficient to support a finding of bad faith under the *Terletsky* test is sufficient to support a finding of punitive damages. *Thomas v. State Farm,* 1999 U.S. Dist. Lexis 17384 (November 5, 1999). See *Polselli v. Nationwide Mutual Fire Insurance Co.,* 23 F.2d 747, 751 (3d Cir. 1994).

(96) Given Erie's expansive net worth (averaging $4.8 billion from 1996 through 2000, based on the unrefuted testimony of plaintiff's economist, Jonathan Cunitz), a significant punitive damage award is necessary in order to deter Erie from engaging in similar conduct to other policyholders.

(97) This court specifically accepts the testimony of Mr. Cunitz that a punitive damages award of 10 percent of Erie's net income would not hamper Erie's operations.

(98) Courts have upheld and endorsed punitive damages awards of $150,000 where the underlying underinsured motorist claim was only $15,000—a 10-1 ratio and the ratio of around 1 percent of the defendant's net worth for a punitive damages award. *Wood v. Allstate,* 1997 U.S. Dist. Lexis 14663 (E.D. Pa. 1997); *Dunn v. HOVIC,*

1 F.3d 1371, 1383 (3d Cir. 1993), *cert. denied,* 510 U.S. 1031 (1993).

(99) Erie, at all times, had an obligation to place the interests of Ms. Hollock in the same light as its own interests. *Cowden v. Aetna Casualty & Surety Co.,* 389 Pa. 459, 469, 134 A.2d 223, 228 (1957).

(100) This court finds, by clear and convincing evidence, that Erie's behavior (1) constituted a breach of contract insurance with Ms. Hollock, (2) constitutes "bad faith" as contemplated in section 8371, and (3) was outrageous because Erie acted with reckless indifference toward Ms. Hollock, its insured.

(101) Plaintiff is entitled to punitive damages in an amount approximately 10 times the amount of compensatory damages.

(102) This court finds that an award of $2.8 million in punitive damages is necessary to deter Erie from similar conduct. In rendering this award, the court has considered the character of the acts committed by Erie, the nature and extent of the harm to Ms. Hollock, Erie's own policyholder, and the financial condition of the defendant. This court notes that Erie did not introduce any evidence to contradict the testimony of plaintiff's economist, Jonathan Cunitz, as to Erie's net income, surplus (net worth). This court notes that the *net worth* (surplus) of Erie averaged $4.8 billion from 1996 through 2000, and the amount of punitive damages being awarded is miniscule to Erie's surplus. Pennsylvania law provides that "net worth" of the defendant is to be considered in determining the amount of punitive damages to be awarded to deter future conduct. Given the vast net worth of Erie, the court finds that a lesser award would not

have the deterrent effect which forms the basis for punitive damages. Further, in awarding punitive damages this court has considered, at great length, the conduct of Erie and its employees not only during the pendency of the Hollock UIM claim, but, just as importantly, throughout the trial. As the fact-finder this court was and is appalled by the deliberate indifference and, in some instances, blatant dishonesty, exhibited by Erie and its employees. More troubling to this court is the sanctioning of deceit by Erie supervisory personnel which clearly indicates that it is Erie's corporate belief that it is acceptable to tell a little lie so long as no one really gets hurt. Good faith claims handling is synonymous with honest claims handling and it is felt by this court that an award of punitive damages in an amount any less than $2.8 million will either distort this court's message to Erie or mean the court's call to honesty in claims handling has fallen on deaf ears. See *Martin v. National Grange,* no. 2000 0527 (Centre Cty., November 15, 2000), and *Campbell v. State Farm,* Supreme Court Utah no. 981564.

(103) This court awards plaintiff attorneys' fees in the amount of $162,952.50, representing attorneys' fees incurred in the processing of plaintiff's underinsured claim as well as the instant bad faith claim.

(104) As a result of Erie's unreasonable failure to settle the underinsured claim, resulting in the instant bad faith claim, plaintiff also has been compelled to incur substantial costs, which would not have been otherwise incurred if Erie had acted in good faith.

(105) This court awards plaintiff costs in the amount of $35,803.40 for the processing of plaintiff's underinsured claim as well as the instant bad faith claim.

## VERDICT

And now, January 7, 2002, at 1 p.m. following a non-jury trial, the court finds that plaintiff has proven by clear and convincing evidence the defendant, Erie Insurance Exchange, acted in bad faith in violation of 42 Pa.C.S. §8371. The court hereby renders a verdict in favor of plaintiff, Jean A. Hollock, and against the defendant, Erie Insurance Exchange, and awards damages to plaintiff pursuant to 42 Pa.C.S. §8371 as follows:

| | | |
|---|---|---|
| Interest on $450,000 demand from 05/07/97 to 11/24/98 | | $ 80,072.00 |
| Attorney's fees for underinsured motorist claim John D. Nardone, Esquire | | $ 9,922.50 |
| Costs for underinsured motorist claim John D. Nardone, Esquire | | $ 5,483.59 |
| Attorneys' fees for bad faith claim | | $ 153,030.00 |
| John D. Nardone, Esquire | $ 2,047.50 | |
| Patrick E. Dougherty, Esquire | $ 7,380.00 | |
| Lenahan & Dempsey P.C. | $143,602.50 | |
| Costs for bad faith claim | | $ 30,317.81 |
| Patrick E. Dougherty, Esquire | $ 174.00 | |
| Lenahan & Dempsey P.C. | $ 30,143.81 | |
| Punitive damages | | $2,800,000.00 |
| *Total Verdict* | | *$3,078,825.90* |